# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 07-3967

PHILIP BECK, individually and
on behalf of all others similarly
situated, and derivatively on behalf of
Equity Office Property Trust,

*Plaintiff-Appellant,*

*v.*

THOMAS E. DOBROWSKI, *et al.*,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 06 C 6411—**Harry D. Leinenweber**, *Judge.*

ARGUED SEPTEMBER 24, 2008—DECIDED MARCH 20, 2009

Before POSNER, WOOD, and TINDER, *Circuit Judges.*

POSNER, *Circuit Judge.* The plaintiff sued the members
of the board of directors of the former Equity Office
Property Trust charging that they had violated section
14(a) of the Securities Exchange Act, 15 U.S.C. § 78n(a),
and the SEC's implementing Rule 14a-9, 17 C.F.R.
§ 240.14a-9, which forbid material misrepresentations or

omissions in soliciting a shareholder's proxy vote. There is also a state-law claim. The district judge dismissed the federal part of the suit for failure to state a claim. Fed. R. Civ. P. 12(b)(6). He ruled that the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4, is applicable to suits under section 14(a), which is correct, §§ 78u-4(b)(1), (2), (4), and that it required the complaint to state "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," § 78u-4(b)(2), which is incorrect. Invoking the doctrine of abstention, he dismissed the state-law claim as well and thus the entire suit.

There is no required state of mind for a violation of section 14(a); a proxy solicitation that contains a misleading misrepresentation or omission violates the section even if the issuer believed in perfect good faith that there was nothing misleading in the proxy materials. *Kennedy v. Venrock Associates*, 348 F.3d 584, 593 (7th Cir. 2003); *In re Exxon Mobil Corp. Securities Litigation*, 500 F.3d 189, 196-97 (3d Cir. 2007); *Shidler v. All American Life & Financial Corp.*, 775 F.2d 917, 926-27 (8th Cir. 1985); *Gerstle v. Gamble-Skogmo, Inc.*, 478 F.2d 1281, 1300-01 (2d Cir. 1973); 3 Alan R. Bromberg & Lewis D. Lowenfels, *Bromberg & Lowenfels on Securities Fraud & Commodities Fraud* § 8.4(430), pp. 204.71-72 (2d ed. 1996). The requirement in the Private Securities Litigation Reform Act of pleading a state of mind arises only in a securities case in which "the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind." 15 U.S.C. § 78u-4(b)(2). Section 14(a) requires proof only that the proxy solicitation was misleading, implying at worst negligence

by the issuer. *Kennedy v. Venrock Associates, supra*, 348 F.3d at 593. And negligence is not a state of mind; it is a failure, whether conscious or even unavoidable (by the particular defendant, who may be below average in his ability to exercise due care), to come up to the specified standard of care. E.g., *Desnick v. ABC*, 233 F.3d 514, 518 (7th Cir. 2000); *United States v. Ortiz*, 427 F.3d 1278, 1283 (10th Cir. 2005); W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 31, p. 169 (5th ed. 1984) ("negligence is conduct, and not a state of mind"). That is a basic principle of tort law, though it is sometimes overlooked, as in *Dasho v. Susquehanna Corp.*, 461 F.2d 11, 29-30 n. 45 (7th Cir. 1972).

The problems with the complaint are profound, but lie elsewhere. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), teaches that a defendant should not be burdened with the heavy costs of pretrial discovery that are likely to be incurred in a complex case unless the complaint indicates that the plaintiff's case is a substantial one. As the Supreme Court had earlier explained, a litigant must not be permitted to use "a largely groundless claim to simply take up the time of a number of other people, with the right to do so representing an in terrorem increment of the settlement value, rather than a reasonably founded hope that the [discovery] process will reveal relevant evidence." *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 741 (1975); see also *Limestone Development Corp. v. Village of Lemont*, 520 F.3d 797, 802-03 (7th Cir. 2008). He is not to be allowed to extort a settlement by reason of the defendant's having to incur heavy litigation expenses if the suit proceeds beyond the pleading stage even if it is a groundless suit.

The essential facts in this case, either as alleged in the complaint or judicially noticeable, are (with some simplification) as follows. Equity Office Property Trust (we'll abbreviate it to "EO") was a real estate investment trust—the equivalent of a corporation—and the plaintiff was one of its shareholders. On November 19, 2006, EO's board of directors signed an agreement with Blackstone Group L.P., the private-equity firm, to sell EO to Blackstone for $48.50 per share, all cash, for a total of $36 billion. The agreement, which was subject to approval by EO's shareholders, allowed EO to terminate the agreement if it received a better offer, but in that event it would have to pay Blackstone a termination fee of $200 million.

A shareholders' meeting to consider the deal with Blackstone was scheduled for February 5, 2007. EO's board mailed a proxy solicitation to its shareholders in the hope of collecting enough proxies to assure a favorable vote at the meeting.

A bidding war ensued, for on January 17, 2007, EO received an offer from Vornado Realty Trust to buy EO for $52 per share, payable 60 percent in cash and 40 percent in Vornado stock; the purchase would have to be approved by Vornado's shareholders. EO issued a press release describing the offer; filed the press release electronically with the Securities and Exchange Commission, which published it on its website; and mailed its shareholders a supplemental proxy solicitation.

A week later, Blackstone raised its offer to $54 per share. EO's board promptly accepted the offer and agreed to increase the termination fee to $500 million. There was

the same flurry of publicity, press release, filing with the SEC, and mailing of a supplemental proxy solicitation to the shareholders.

Vornado responded on February 1 by raising its offer for EO to $56 per share but reducing the percentage of payment that would be in cash rather than stock from 60 percent to 55 percent. There was the same flurry of publicity, filing, etc., but in a supplemental proxy solicitation EO's board continued to recommend that the shareholders approve the acquisition by Blackstone. So on February 4 Vornado proposed a new deal: an initial cash tender offer for up to 55 percent of EO's shares to be followed by the acquisition of the remaining shares by swapping Vornado shares for them. The advantage to EO of this alternative would be speed; a shareholder vote would not be required for acceptance of the cash tender offer.

Blackstone counterattacked by raising its all-cash offer to $55.25. EO's board responded by demanding $55.50, and Blackstone agreed but on the condition (to which the board acceded) that the termination fee be raised from $500 million to $720 million. There was again a flurry of publicity, filing, etc., and a supplemental proxy solicitation in which EO's board recommended approval of the Blackstone proposal. Vornado threw in its hand. It announced that it was dropping out of the bidding for EO because "the premium it would have to pay to top Blackstone's latest bid, protected by a twice increased breakup fee [the $720 million], would not be in its shareholders' interest." On February 7, EO's shareholders voted overwhelmingly to approve Blackstone's new bid.

The plaintiff intimates a possible impropriety in Blackstone's having demanded a stiff termination fee, which would have increased the cost to Vornado of outbidding Blackstone. That would not be a proper claim under section 14(a) of the Securities Exchange Act, however, because it has nothing to do with misrepresentations and anyway Blackstone is not a defendant. The fee was disclosed to EO's shareholders and they could have voted against accepting Blackstone's final offer precisely because it would end the bidding war by making a higher bid too expensive for Vornado to be willing to make.

As we noted in *Stark Trading v. Falconbridge Ltd.*, 552 F.3d 568, 572 (7th Cir. 2009), the antifraud provisions of federal securities law are not a general charter of shareholder protection—which is not to suggest that termination fees in bidding contests are generally improper under any body of law with which we are familiar. See *Venture Associates Corp. v. Zenith Data Systems Corp.*, 96 F.3d 275, 278 (7th Cir. 1996); *Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 578-79 (11th Cir. 1988); *Brazen v. Bell Atlantic Corp.*, 695 A.2d 43, 48-50 (Del. 1997). Blackstone was forgoing other investment opportunities in preparation for having to shell out $39 billion in cash to buy EO. Granted, if the fee were a high percentage of the bid, then, as the cases we have cited suggest, its acceptance by the board of the target company might disserve the target's shareholders by ending the bidding war prematurely. That is not the case here (or for that matter in most cases involving "deal protection" provisions of that sort, see Micah S. Officer, "Termination Fees in Mergers and

Acquisitions," 69 *J. Fin. Econ.* 431, 462-63 (2003)), but the essential point is that, to repeat, the termination fee had nothing to do with any representations or omissions in the proxy solicitations.

But the plaintiff also argues that had it not been for misleading proxy solicitations, EO's shareholders would have rejected the merger and by doing so have "reaped the economic benefits of continuing to own [EO] shares." That there would have been net benefits is proved, he argues, by the fact that Vornado's offer of $56 in cash and stock was superior to Blackstone's final all-cash offer of $55.50, which shows that EO shares had been sold to Blackstone for less than their market value. But the premise is incorrect. Vornado's offer was not superior to Blackstone's. The difference between $55.50 and $56 is less than 1 percent, and while Blackstone was prepared to pay the full price for EO on closing, Vornado could not have completed the purchase of EO until and unless its shareholders approved the acquisition, which would take months. At any plausible discount rate, a delay of several months in EO's receipt of 45 percent of the purchase price (the percentage that was to be paid for in stock, thus requiring the approval of Vornado's shareholders, rather than in cash) would reduce the present value of Vornado's offer by more than 1 percent.

In addition, the sale of EO for cash was less risky than would have been a sale almost half of which would have been in Vornado's stock, a risky asset. A purchase for cash reduces the seller's risk compared to a purchase for stock (in whole or part), and that is a benefit for which

many sellers will pay. E.g., Frank C. Evans & David M. Bishop, *Valuation for M&A: Building Value in Private Companies* 226-27 (2001). It is true that some taxpayers reap tax advantages from the sale of a company for stock rather than cash, Dale Arthur Oesterle, *The Law of Mergers and Acquisitions* 800-14 (3d ed. 2005), but the plaintiff does not claim to be one of them.

A suit of this kind if it succeeded would place corporate management on a razor's edge. Had EO's board accepted Vornado's offer in lieu of Blackstone's, the plaintiff would be suing the board members for having turned down a better offer, especially since the price of Vornado's stock plunged in the months following the sale to Blackstone. Had EO turned down both offers, the plaintiff would be suing the board members for having failed to foresee the calamitous fall in real estate prices after the acquisition (remember, EO was a real estate investment trust). Any evidence that the plaintiff would have presented, either in this case or in our hypothetical cases, concerning the optimal strategy for EO to have pursued would have been heavy on hindsight and speculation, light on verifiable fact.

Even if the complaint could survive the criticisms that we have made so far (and it could not), the plaintiff's allegations that the proxy solicitations contained misrepresentations or misleading omissions were too feeble to allow the suit to go forward under the standard set forth by the Supreme Court in the *Bell Atlantic* case. The plaintiff contends that the shareholders might have liked to have more backup information, and perhaps some of

them would have. But there is nothing in the complaint to suggest that any shareholder was misled or was likely to be misled by the dearth of backup information—that is, that the shareholder drew a wrong inference from that dearth. The complaint does allege that the proxy materials failed to specify the benefits that top executives of EO would receive from Blackstone, but there is no suggestion that these gains were greater than what the executives would have received from Vornado. Nor is there any indication of what other executives receive in similar acquisitions. So again there is no evidence of loss, or indeed of materiality.

It is true that besides forbidding misleading statements or omissions in proxy materials, section 14(a) requires that the materials contain such information as the SEC may require be included. 15 U.S.C. § 78n(a); *Resnik v. Swartz*, 303 F.3d 147, 151 (2d Cir. 2002); Jonathan M. Hoff, Lawrence A. Larose & Frank J. Scaturro, *Public Companies* § 3.08[4][b], pp. 3-31 to 3-32 (2006). But the complaint does not allege that Blackstone omitted any required information.

The plaintiff's main argument for why the proxy solicitations were (he thinks) misleading has, paradoxically, nothing to do with their content. It is that the last solicitation, the one recommending against acceptance of Vornado's sweetened offer of February 1, was mailed too soon before the February 7 meeting of EO's shareholders to enable them to cast an informed vote. More precisely—since the solicitation was mailed promptly after Vornado announced the sweetened offer—the argu-

ment is that the meeting should have been postponed to February 15, for the plaintiff contends that a proxy solicitation must be mailed at least 14 days before the shareholders' meeting. But that is not a rule for a court to impose. It is a matter for the SEC to consider if it wants, because it involves a delicate tradeoff best confided to specialists in the securities markets. On the one hand, the longer the interval between mailing a proxy solicitation and the shareholders' meeting the more time shareholders have to consider the solicitation carefully. On the other hand, the longer the interval the likelier the proposed transaction is to fall apart because of a change in the price of the stock of the firm to be acquired (or a change in the relative stock prices of the acquiring and the to-be-acquired firm if it is not an all-cash transaction), or because of the unwillingness or inability of one or both of the parties to remain in limbo waiting for the deal to close. In favor of giving more weight to the costs of delay is the electronic revolution, as a result of which financial like other information spreads far more rapidly than it used to. Of course not all owners of stock in EO read the financial media daily, but many of them did, or were advised by brokers or investment advisers, and in either case would have sold their stock well before the shareholders' meeting.

In fact, as soon as Blackstone's first offer was announced, speculators would have bought EO stock in the expectation that a bidding war would ensue and the price of EO stock be bid higher, *Basic Inc. v. Levinson*, 485 U.S. 224, 234-35 (1988); speculators do not await the arrival of proxy solicitations by snail mail to decide how to vote their shares. Such speculation might, by making EO seem

more valuable, have increased the price that Blackstone would have had to offer for EO to close the deal. See *Flamm v. Eberstadt*, 814 F.2d 1169, 1176 (7th Cir. 1987); James Harlan Koenig, "The *Basics* of Disclosure: The Market for Information in the Market for Corporate Control," 43 *U. Miami L. Rev.* 1021, 1054-57 (1989). That possibility in turn might have reduced the price that Blackstone was willing to offer to pay, and is another reason not to prescribe a waiting period for consideration of competing offers.

Worse, if the plaintiff prevailed in this suit, he would have succeeded in sinking the process of corporate acquisition into a sea of molasses by requiring that every fresh offer to buy a company reset the clock for shareholder approval. If Vornado's offer of February 1 required delaying EO's shareholder meeting to February 15, then Vornado's amended offer of February 4 required a further delay of the meeting to February 19. During that interval, Vornado might have amended the offer further, producing indefinite delay and escalating termination fees and perhaps causing Blackstone to abandon its offer, which was conditional on the shareholders' meeting being held on February 7.

We have now to consider the plaintiff's state-law claim, which is that EO's directors violated their fiduciary duties to the corporation's shareholders, duties created by the law of Maryland, the state in which EO was incorporated. The claim reflects the fact noted earlier that the plaintiff's quarrel with the defendant is not primarily over alleged misrepresentations in proxy materials but is

rather over the failure, as it seems to the plaintiff, of EO's board to maximize shareholder value. The district judge dismissed this claim in an exercise of *Colorado River* abstention—abstention by a federal court in favor of the court in which a parallel proceeding is pending. E.g., *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 817-18 (1976); *Starzenski v. City of Elkhart*, 87 F.3d 872, 878 (7th Cir. 1996); 17A Charles Alan Wright et al., *Federal Practice & Procedure* § 4247 (2008). Other shareholders of EO had filed in Maryland state courts suits identical to the plaintiff's state-law claim in this suit, and those suits had gone to judgment in favor of the defendants and were on appeal when the district judge abstained; they are still on appeal.

The plaintiff was not a party to the Maryland litigation, but that is not critical. *Clark v. Lacy*, 376 F.3d 682, 684-87 (7th Cir. 2004); *Caminiti & Iatarola, Ltd. v. Behnke Warehousing, Inc.*, 962 F.2d 698, 700-01 (7th Cir. 1992); *Romine v. Compuserve Corp.*, 160 F.3d 337, 340 (6th Cir. 1998). For if it were, different members of what should be a single class could file identical suits in federal and state courts to increase their chances of a favorable settlement. The state-law issues that our plaintiff has presented to the federal court will be definitively resolved by the courts of the state whose law governs those issues, and our court would be required to defer to that resolution because state courts are the authoritative expositors of their own state's laws.

So the judge acted well within his discretion in declining to exercise jurisdiction over the plaintiff's state-

law claim. But insofar as the plaintiff based federal juris-diction over that claim on the district court's supple-mental jurisdiction, invocation of the doctrine of *Colorado River* was unnecessary, in view of the presumption that when a federal suit is dismissed before trial the court should relinquish any supplemental state-law claim to the state courts. 28 U.S.C. § 1367(c)(3). The presumption is strengthened when, as in this case, an identical case is already pending in state court and is nearer final resolution than the claim in the federal suit. *Tyrer v. City of South Beloit*, 456 F.3d 744, 755 (7th Cir. 2006); *Caminiti & Iatarola, Ltd. v. Behnke Warehousing, Inc., supra*, 962 F.2d at 702; *Cruz v. Melecio*, 204 F.3d 14, 23-24 (1st Cir. 2000).

But abstention was the proper course if, despite the plaintiff's invocation of the supplemental jurisdiction, there is also diversity jurisdiction. That may seem doubt-ful. Some members of his class are citizens of states of which one or more of the defendants are also citizens; and the Class Action Fairness Act, which creates federal diversity jurisdiction of class actions that lack complete diversity between the plaintiffs and the defendants, has an exception for suits relating to the internal affairs of a corporation, or other business enterprise, that might be (though we need not decide whether it is) applicable to a suit such as this. See 28 U.S.C. § 1332(d)(9)(B); Steven M. Puiszis, "Developing Trends with the Class Action Fairness Act of 2005," 40 *John Marshall L. Rev.* 115, 138-39 (2006). Furthermore, the plaintiff purports to be suing on behalf of EO, which has the same citizenship as several defendants. But this is just to say that the suit is a deriva-

tive suit, the benefits of which, if the suit succeeds, will accrue to the shareholders, who are the owners of EO. A corporation is controlled by its management, and when the management opposes the derivative suit the corporation is treated as a defendant rather than as a plaintiff for purposes of determining whether there is diversity jurisdiction. *Smith v. Sperling*, 354 U.S. 91, 95-97 (1957); *Doctor v. Harrington*, 196 U.S. 579, 587 (1905); *In re Digimarc Corporation Derivative Litigation*, 549 F.3d 1223, 1234-35 (9th Cir. 2008); *Gabriel v. Preble*, 396 F.3d 10, 14-15 (1st Cir. 2005). In effect, this suit is a revolt by shareholders against the members of the board that engineered EO's sale to Blackstone.

But what of the citizenship of the shareholders on whose behalf the plaintiff is suing? Because it is a derivative suit, a favorable judgment would accrue to all the shareholders, many of whom are citizens of the same states as the defendants. Does this destroy complete diversity? As a matter of logic, yes. But concerned that such logic would have the practical effect of precluding diversity jurisdiction of derivative suits, the courts do not consider the citizenship of individual shareholders (other than a named party) in a derivative suit when determining whether there is diversity jurisdiction. *New Albany Waterworks v. Louisville Banking Co.*, 122 F. 776, 778-79 (7th Cir. 1903); 7C Wright et al., *supra*, § 1822, pp. 19-20.

So *Colorado River* abstention was the right doctrine after all for deciding whether to retain the plaintiff's state-law claim in federal court.

The judgment of the district court is

AFFIRMED.