In the

# United States Court of Appeals
## For the Seventh Circuit

No. 19-2973

MICHAEL KUEBLER, et al.,

*Plaintiffs-Appellants*,

*v.*

VECTREN CORPORATION, et al.,

*Defendants-Appellees*.

Appeal from the United States District Court for the
Southern District of Indiana, Evansville Division.
No. 3:18-cv-00113-RLY-MPB — **Richard L. Young**, *Judge*.

ARGUED SEPTEMBER 18, 2020 — DECIDED SEPTEMBER 13, 2021

Before SYKES, *Chief Judge*, and HAMILTON and ST. EVE, *Circuit Judges*.

HAMILTON, *Circuit Judge*. This securities case arose from the 2018 merger between Vectren Corporation, an Indiana public utility and energy company, and CenterPoint Energy, Inc., a public utility holding company. CenterPoint eventually acquired all Vectren stock for $72.00 per share in cash. In the meantime, however, several Vectren shareholders filed this

suit alleging violations of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78a et seq.

First, the shareholders tried to enjoin the shareholder vote on the merger. The district court denied that request. The shareholders then filed an amended complaint alleging that Vectren's Proxy Statement was misleading in violation of Section 14(a) of the Exchange Act, § 78n(a). Plaintiffs argued that the Proxy Statement should have included two omitted financial metrics used by Vectren's financial advisor in its analysis leading to its opinion that the merger terms were fair to Vectren shareholders. The first omitted metric, Unlevered Cash Flow Projections, forecast the gross after-tax annual cash flow for Vectren between 2018 and 2027. The second omitted metric, Business Segment Projections, showed separate financial projections for each of Vectren's three main business lines.

Without this information, the shareholders allege, they were unable to assess the fair value of their Vectren shares because they could not replicate the adviser's valuation analysis. In other words, the shareholders believe that the adviser undervalued their Vectren shares, and they wanted to double-check its work. The district court granted Vectren's motion to dismiss, finding that the shareholders had failed to allege adequately both materiality of the omissions and any resulting economic loss. We affirm.

I.  *Factual Background*

  A.  *The Merger*

We review de novo a district court's decision on a motion to dismiss for failure to state a claim under Rule 12(b)(6), treating plaintiffs' well-pleaded factual allegations as true and giving the plaintiffs the benefit of reasonable inferences from

them. *Manistee Apartments, LLC v. City of Chicago*, 844 F.3d 630, 633 (7th Cir. 2016).

In late 2017, Vectren began to explore the possibility of a strategic merger. In January 2018, Vectren retained Merrill Lynch as its financial advisor and directed it to contact parties who might be interested in acquiring Vectren. Vectren's board of directors told Merrill Lynch to tell potential buyers that the board strongly preferred a transaction in which a substantial portion of the consideration would be paid in cash rather than other securities.

By February 2018, Vectren had narrowed the pool of interested buyers to four serious contenders: CenterPoint and three others that we refer to as Bidders A, B, and D. On February 21, all four submitted non-binding proposals. CenterPoint proposed an all-cash transaction at $70.00 per share. Bidder A proposed a price of $72.50 per share with up to 83 percent in cash and the remainder in common stock of Bidder A. Bidder B proposed an all-cash price range of $73.00 to $75.00. Bidder D proposed a price range of $65.00 to $70.00 paid in an unspecified combination of cash and stock of Bidder D. Through late February and March, Vectren negotiated with all four toward the end of inviting binding offers to acquire Vectren.

In early April, CenterPoint and Bidder A submitted new offers. Bidder A proposed $70.50 per share with a mix of 83 percent cash and 17 percent common stock of Bidder A. CenterPoint proposed $70.00 per share, all cash. Bidders B and D declined to submit binding offers. The Vectren board told management to continue negotiating with both Bidder A and CenterPoint and to tell them that the board was not ready to

move forward at less than $72.00 per share and strongly pre-
ferred an all-cash or substantially all-cash deal.

On April 16, CenterPoint and Bidder A submitted their
"best and final" offers. Bidder A offered $71.00 per share, with
the initial 83 percent to 17 percent cash-stock mix unchanged.
CenterPoint increased its offer to $71.50, all cash. On April 18,
Merrill Lynch told CenterPoint that Vectren wanted to move
forward if CenterPoint was willing to negotiate on the final
price per share and on certain other terms (primarily related
to operational restrictions, financing covenants, and termina-
tion fees). Merrill Lynch also said that the board continued to
push for a final offer of at least $72.00 per share. CenterPoint
said it was prepared to offer that price, and over the next three
days, CenterPoint and Vectren hammered out the remaining
issues in the merger agreement.

On April 21, 2018, the Vectren board met to consider the
final terms of CenterPoint's offer at $72.00 per share, all cash.
The $72.00 per share was a 17.4 percent premium over the
stock's closing price on August 21, 2017, the last day before
the first media reports about a possible takeover of Vectren.
Following the meeting, Merrill Lynch reviewed the financial
aspects of the transaction and provided the board with its fair-
ness opinion. The opinion said that as of April 21, subject to
various assumptions and limitations described in the opinion,
Merrill Lynch deemed the $72.00 per share price to be fair.
Later that day, the Vectren board unanimously adopted the
merger agreement, and Vectren and CenterPoint executed the
agreement. On April 23, the merger was announced publicly.

B.  *The Lawsuit*

On June 18, 2018, Vectren filed its preliminary proxy statement. In response, six shareholders sued Vectren and its board alleging that the preliminary proxy statement was misleading because it omitted key information. A seventh shareholder filed suit after Vectren filed its definitive proxy statement with the U.S. Securities and Exchange Commission on July 16.

All seven suits alleged violations of Section 14(a) of the Exchange Act. When two of the seven shareholders moved to enjoin the planned shareholder vote on the merger, the district court consolidated the seven suits and appointed Michael Kuebler, James Danigelis, and Michael Nisenshal as lead plaintiffs. Following a hearing, the district court denied a preliminary injunction. Shareholders voted on August 28. The merger was approved by 61.6 percent of Vectren's outstanding shares, which amounted to more than 95 percent of the total shares voted. Vectren and CenterPoint announced the completion of their merger on February 1, 2019.

After their effort to block the merger failed, plaintiffs amended their complaint to ask for damages based on the omission of two allegedly material financial metrics that they alleged rendered the Proxy Statement "misleadingly incomplete" in violation of Section 14(a) of the Exchange Act and the SEC's implementing Rule 14a-9, 17 C.F.R. § 240.14a-9. The first category of omitted metrics, Unlevered Cash Flow Projections, showed the gross after-tax cash flow that Vectren was forecast to generate annually between 2018 and 2027. The second category, Business Segment Projections, reflected individual financial projections for Vectren's three main business lines: gas, electric, and non-regulated (engineering and

construction). The district court granted the defendants' motion to dismiss for failure to state a claim. *Kuebler v. Vectren Corp.*, 412 F. Supp. 3d 1000 (S.D. Ind. 2019).

Before diving into the law of Section 14(a), we address a procedural wrinkle that arose in the district court. Plaintiffs sought to bolster their allegations by attaching to the amended complaint an affidavit from a financial expert, M. Travis Keath. The district court did not consider the Keath affidavit on the ground that it did not form the basis of plaintiffs' claims but was "merely *evidence*." *Id.* at 1004. For that reason, the court explained, the Keath affidavit was irrelevant in determining whether plaintiffs had stated a claim. On this procedural point, we respectfully disagree.

A plaintiff opposing a Rule 12(b)(6) motion to dismiss may submit evidence to illustrate allegations without turning that motion into a Rule 56(a) motion for summary judgment. A defendant filing a motion under Rule 12(b)(6) or 12(c) can base its motion on only "the complaint itself, documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice." *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012).

In opposing such a motion, however, a plaintiff enjoys much more flexibility. In the wake of *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), a plaintiff who is opposing a Rule 12(b)(6) or Rule 12(c) motion and who can "show a court that there is likely to be some evidentiary weight behind the pleadings the court must evaluate" may find it beneficial to do so. *Geinosky*, 675 F.3d at 745 n.1, quoting *Roe v. Bridgestone Corp.*, 492 F. Supp. 2d 988, 1007 (S.D. Ind. 2007); see also *Peterson v. Wexford Health*

*Sources, Inc.*, 986 F.3d 746, 752 n.2 (7th Cir. 2021) ("In 'opposing a Rule 12(b)(6) motion,' Peterson was free to 'elaborate on his factual allegations so long as the new elaborations are consistent with the pleadings.'"), quoting *Geinosky*, 675 F.3d at 745 n.1; *Bell v. Publix Super Markets, Inc.*, 982 F.3d 468, 480 n.2 (7th Cir. 2020) ("In opposing a motion to dismiss … a plaintiff may describe the evidence she expects to offer to support factual allegations, and nothing prevents a plaintiff from … tendering affidavits … to show that those expectations about evidence are realistic.") (citations omitted); *Bishop v. Air Line Pilots Ass'n*, 900 F.3d 388, 399 & n.28 (7th Cir. 2018) ("under the more stringent pleading standards" of *Iqbal* and *Twombly*, district court properly considered "several exhibits that [were] consistent with the allegations in the complaint"). Accordingly, there was nothing improper in plaintiffs' inclusion of the Keath affidavit or their reliance upon it in opposing dismissal.

As explained below, however, the Keath affidavit does not provide sufficient support for plaintiffs' assertion that the omitted metrics were material to voting for or against the proposed merger. See *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976). While the Keath affidavit generally supports plaintiffs' position that shareholders would have liked to have more information rather than less, it does not help plaintiffs explain why any shareholder was actually or likely to have been misled by the omission of the two additional metrics in light of all the other information provided to shareholders in the Proxy Statement. See *Beck v. Dobrowski*, 559 F.3d 680, 685 (7th Cir. 2009) (affirming dismissal of Section 14(a) claim for lack of materiality).

II. *Discussion*

A. *Section 14(a) of the Exchange Act*

Section 14(a) prohibits soliciting proxies in violation of SEC rules and regulations. 15 U.S.C. § 78n(a)(1). The SEC's Rule 14a-9 prohibits including "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact," as well as omitting any material fact required to render statements within the proxy statement not false or misleading. 17 C.F.R. § 240.14a-9(a).

To state a claim under Section 14(a), a plaintiff must allege: (i) that the proxy statement contained a material misstatement or omission that (ii) caused the plaintiff's injury, and (iii) that the proxy solicitation was an essential link in accomplishing the transaction. *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 384–85 (1970).

"An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *TSC Industries*, 426 U.S. at 449. Keeping in mind that a proxy statement is likely to provide a wealth of information, a plaintiff must show "a substantial likelihood that the disclosure of the omitted fact would have … significantly altered the 'total mix' of information" available to investors. *Id.*

Causation in securities law consists of two components: transaction causation and loss causation. *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005); *Grace v. Rosenstock*, 228 F.3d 40, 47 (2d Cir. 2000). Transaction causation, often called reliance, is generally easier to establish than loss causation. See *Dura Pharmaceuticals*, 544 U.S. at 345–46.

Where materiality is alleged and proven, proof of reliance on the particular statement or omission is not necessary. *Mills*, 396 U.S. at 384–85 (rejecting court of appeals' additional requirement of proof that specific defect in proxy statement actually had a decisive effect on voting). The proxy solicitation itself serves as the causal link in the transaction—that the challenged violation(s) caused the plaintiff to engage in the challenged transaction. *Id.* at 385; *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1099–1100 (1991). The loss causation requirement, codified in the Private Securities Litigation Reform Act (PSLRA), requires a plaintiff to allege and prove that the challenged misrepresentations or omissions caused her economic loss. 15 U.S.C. § 78u-4(b)(4); *Dura Pharmaceuticals*, 544 U.S. at 342; see also *Law v. Medco Research, Inc.*, 113 F.3d 781, 786–87 (7th Cir. 1997) (§ 78u-4(b)(4) codified judge-made "loss causation" rule).[1]

Finally, the PSLRA imposes heightened pleading requirements on Section 14(a) plaintiffs. 15 U.S.C. § 78u-4(b)(1); *Beck*, 559 F.3d at 681–82. Plaintiffs must identify each statement alleged to have been misleading, the reason why each statement

---

[1] In *Dura Pharmaceuticals*, the Supreme Court held that both transaction causation and loss causation are required under Section 10(b) of the Exchange Act. 544 U.S. at 341–42. The Court has yet to decide whether loss causation and transaction causation must both be proved under Section 14(a), as well, but we are persuaded by the Second and Ninth Circuits that the Court's reasoning extends to Section 14(a) claims. See *Grace*, 228 F.3d at 47 ("both loss causation and transaction causation must be proven in the context of a private action under § 14(a) of the 1934 Act and SEC Rule 14a-9"), citing *Wilson v. Great American Indus., Inc.*, 979 F.2d 924, 931 (2d Cir. 1992); *New York City Employees' Retirement Sys. v. Jobs*, 593 F.3d 1018, 1023 (9th Cir. 2010), overruled in part on other grounds by *Lacey v. Maricopa County*, 693 F.3d 896 (9th Cir. 2012) (en banc).

was misleading, and all relevant facts supporting that conclusion. 15 U.S.C. § 78u-4(b)(1).

In granting the defendants' motion to dismiss, the district court held that plaintiffs had failed to allege adequately both materiality and loss causation. *Kuebler*, 412 F. Supp. 3d at 1012. We consider each issue in turn.

B. *Materiality*

The issue of materiality is a mixed question of law and fact. *TSC Industries*, 426 U.S. at 450. A court may resolve the question of materiality as a matter of law, however, when the information at issue is "so obviously unimportant" to an investor "that reasonable minds could not differ on the question." *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 162 (2d Cir. 2000); accord, *Basic Inc. v. Levinson*, 485 U.S. 224, 231 (1988), following *TSC Industries*, 426 U.S. at 449. Here, the district court determined that the omitted Business Segment Projections and Unlevered Cash Flow Projections were immaterial as a matter of law in light of all the other information disclosed in the Proxy Statement. We agree.

1. *Plaintiffs' Requested "Plainly Immaterial" Standard*

Plaintiffs argue first that the district court imposed too stringent a standard and that dismissal should be denied unless the alleged omissions were "plainly immaterial," citing *Carvelli v. Ocwen Financial Corp.*, 934 F.3d 1307 (11th Cir. 2019). *Carvelli* held that the puffery defense, generally accepted in the common-law context, also applies under securities laws: "Excessively vague, generalized, and optimistic comments—the sorts of statements that constitute puffery—aren't those that a 'reasonable investor,' exercising due care, would view as moving the investment-decision needle—that is, they're

not material." *Id.* at 1320. The court continued, "when considering a motion to dismiss a securities-fraud action, a court shouldn't grant unless the alleged misrepresentations—puffery or otherwise—are 'so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'" *Id.* at 1320–21, quoting *Ganino*, 228 F.3d at 162.

We do not disagree with plaintiffs' reliance on *Carvelli* or *Ganino*. We do disagree, however, with plaintiffs' attempt to divorce the "so obviously unimportant" language from both the larger context of *Carvelli* and the governing materiality standard in *TSC Industries*. We do not read *Carvelli*'s "so obviously unimportant" language as narrowing the materiality standard in *TSC Industries*, which used essentially the same language. 426 U.S. at 450. Rather, the *Carvelli* language was intended to caution that the conclusion that a statement constitutes puffery does not relieve a court from considering even the unlikely possibility that, in context and in light of the total mix of available information, a reasonable investor might still attach importance to the "puffed" statement. *Carvelli*, 934 F.3d at 1320. In doing so, *Carvelli* reiterated the familiar *TSC Industries* materiality standard—which the district court here applied correctly. That standard requires courts to look at *all* available information in determining the materiality of a challenged omission or misstatement. *Id.* at 1317; accord, *Basic Inc.*, 485 U.S. at 231–32; *TSC Industries*, 426 U.S. at 449. With *TSC Industries*' holistic approach to the materiality of omissions in view, we turn to the Proxy Statement.

2.  *Whether the Omitted Projections Were Material*

(a) *The Proxy Statement*

The Proxy Statement provided voluminous information about the background of the merger and its projected financial and community impacts. Most relevant to this appeal, the Proxy Statement summarized Merrill Lynch's fairness opinion, including three valuation analyses: one based on discounted cash flow, one using comparisons to other publicly traded companies, and a third comparing other similar transactions. Only the discounted cash flow analysis is at issue here. The summary included a table of forward-looking financial information prepared by Vectren's management and provided to Merrill Lynch. Plaintiffs allege that omission of the Business Segment Projections and Unlevered Cash Flow Projections rendered the summary of the discounted cash flow analysis and the table summarizing forward-looking financial information "misleadingly incomplete."

(1) *The Discounted Cash Flow Analysis*

A discounted cash flow analysis estimates the present value of an investment based on future cash flows. If the discounted cash flow exceeds the current cost of the investment, the opportunity could result in positive returns. Merrill Lynch's discounted cash flow analysis used the weighted cost of capital—the average rate of return that the company's shareholders expect for a given year—as the discount rate. Here, as part of its fairness opinion, Merrill Lynch performed the discounted cash flow analysis to estimate the present value of the unlevered, after-tax free cash flows that Vectren was forecast to generate from 2018 through 2027. These estimates are the omitted Unlevered Cash Flow Projections.

As detailed in the Proxy Statement, Merrill Lynch per-
formed the discounted cash flow analysis as a sum-of-the-
parts analysis, first calculating the cash flows and terminal
values for Vectren's gas utility business, its electric utility
business, and its non-regulated business segments, respec-
tively, to the year 2027.[2] These estimated values are the omit-
ted Business Segment Projections. Next, Merrill Lynch dis-
counted the cash flows and terminal values for each business
segment to their respective present values as of December 31,
2017.

To do this, Merrill Lynch used three discount rate ranges
based on each business segment's weighted average cost of
capital: (i) 5.0 to 5.8 percent for the gas utility business; (ii) 4.7
to 5.4 percent for the electric utility business; and (iii) 7.8 to
9.6 percent for the non-regulated business. Merrill Lynch then
deducted net debt as of December 31, 2017, to derive equity
values for each segment. From there, Merrill Lynch combined
the low ends of the equity value ranges for each business seg-
ment to calculate a low estimate for Vectren's implied equity
value, and it combined the high ends of the equity value
ranges for each business segment to calculate a high estimate.
This process yielded an implied per share equity value range
for Vectren of $59.00 to $75.25. The final merger price of $72.00
per share was near the high end of that range.

(2) *The Consolidated Projections*

The table summarizing forward-looking financial projec-
tions, referred to by plaintiffs as the "Consolidated Projec-
tions," included estimates of net income, depreciation and

---

[2] A terminal value assumes that a business or business segment will
grow at a set growth rate in perpetuity after the forecast period.

amortization, EBITDA,[3] and capital expenditures for 2018 through 2027. Here is the table of financial projections actually provided in the Proxy Statement, but with only the first four years:

| | Year Ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | 2018 | 2019 | 2020 | 2021 |
| | (in thousands) | | | |
| Net Income | $ 236,739 | $ 257,429 | $ 280,241 | $ 309,123 |
| Depreciation and Amortization | $ 292,331 | $ 319,246 | $ 342,599 | $ 355,175 |
| EBITDA | $ 685,484 | $ 753,257 | $ 816,175 | $ 877,453 |
| Capital Expenditures, excluding AFUDC equity | $(631,551) | $(622,532) | $(599,633) | $(778,389) |

Vectren's Proxy Statement omitted the Unlevered Cash Flow Projections provided to Merrill Lynch for use in its discounted cash flow analysis.[4]

### (b) *The Omitted Metrics*

On appeal, plaintiffs focus primarily on the Unlevered Cash Flow Projections and Business Segment Projections as they relate to the summary of the discounted cash flow analysis. Plaintiffs argue that without those two metrics, shareholders could not independently assess the Merrill Lynch

---

[3] EBITDA stands for Earnings Before Interest, Taxes, Depreciation, and Amortization. This metric is often used to evaluate a company's operating performance independent of potentially "noisy" factors that can vary from company to company based on existing capital structure, tax issues, and the like.

[4] AFUDC in the table refers to allowance for funds used during construction.

analysis and reach their own opinions on whether $72.00 per share was actually a fair price in the merger. Plaintiffs allege that the omissions rendered the Proxy Statement misleading because the Unlevered Cash Flow Projections are "irreplaceable when it comes to fully, fairly, and properly understanding a company's projections and value."

(1) *Business Segment Projections*

Plaintiffs briefly address the Business Segment Projections, arguing that they were material because they were a key input in Merrill Lynch's discounted cash flow analysis. This argument misses the point. We assume that Merrill Lynch used the Business Segment Projections in its discounted cash flow analysis, but that fact does not automatically render them material for purposes of Section 14(a). Two indisputable facts make the point. First, CenterPoint was offering to acquire Vectren as a whole enterprise, not in individual business segments. Second, plaintiffs owned shares in Vectren as a whole enterprise also, not individual business segments. The proposed merger did not give shareholders the option of selling separate interests in separate business lines. Plaintiffs thus failed to allege a substantial likelihood that a reasonable shareholder would have viewed the Business Segment Projections as significantly altering the total mix of available information material to whether to vote for or against the proposed merger. See *TSC Industries*, 426 U.S. at 449.

(2) *Unlevered Cash Flow Projections*

Plaintiffs devote more attention to the omitted Unlevered Cash Flow Projections, but we agree with Judge Young that those numbers were immaterial as a matter of law, given all the other information provided. As part of the Consolidated

Projections, the Proxy Statement disclosed Vectren's own projections of net income, depreciation and amortization, EBITDA, and capital expenditures. On appeal, plaintiffs assert in conclusory terms the superiority of unlevered cash flow as a measure of a company's intrinsic value, but superiority is not synonymous with materiality. Plaintiffs seek these projections not because of any alleged error in the disclosed Consolidated Projections but because plaintiffs say they wanted to replicate Merrill Lynch's discounted cash flow analysis to make an independent determination of fair value.

(a) *Vectren's Disclosure Obligations Under Section 14(a)*

Plaintiffs argue that the Proxy Statement could not provide a "fair summary" of Merrill Lynch's fairness opinion without disclosing all the key inputs used by Merrill Lynch in its valuation analyses. That argument reaches much too far, exaggerating Vectren's disclosure obligations under Section 14(a).

In *TSC Industries*, the Supreme Court explained the logic underpinning the materiality standard and its requirement that a reasonable investor would have viewed the omitted fact "as having significantly altered the 'total mix' of information made available." 426 U.S. at 449. The Court emphasized that "the disclosure policy embodied in the proxy regulations is not without limit." *Id.* at 448, citing *Mills*, 396 U.S. at 384. To that effect, the Court reasoned that:

> if the standard of materiality is unnecessarily low, not only may the corporation and its management be subjected to liability for insignificant omissions … but also management's fear of

> exposing itself to substantial liability may cause it simply to bury the shareholders in an avalanche of trivial information.

*Id.* The goal is to strike the proper balance between "not enough" information and an "avalanche" of information.

*TSC Industries* rejected this court's more expansive standard of materiality, under which material facts had included "all facts which a reasonable shareholder *might* consider important." *Id.* at 445, quoting *Northway, Inc. v. TSC Industries, Inc.*, 512 F.2d 324, 330 (7th Cir. 1975) (emphasis added). Such a standard, the Court reasoned, painted the operative inquiry in broad brushstrokes unintended by the Court's earlier decisions. *Id.* at 446–47; see, e.g., *Mills*, 396 U.S. at 381 (Section 14(a)'s purpose is to ensure that disclosures by corporate management enable shareholders to make informed choices). Rather, the Court explained, the function of the materiality standard was to evaluate whether there was a substantial likelihood that a reasonable shareholder would have considered the omitted fact important in deciding how to vote. *TSC Industries*, 426 U.S. at 449. It made sense, then, to formulate a standard of materiality that acknowledged the value of the omitted information in light of the total mix of information made available to shareholders. *Id.* Because shareholders did not decide how to vote in the abstract, it did not make sense to assess the value of an omitted fact in the abstract.

Deciding materiality of the omissions here requires us to start from all the information made available to shareholders in the Proxy Statement, including the Consolidated Projections for net income, depreciation and amortization, EBITDA, and capital expenditures, excluding AFUDC equity. Plaintiffs simply have not articulated a plausible theory under which

they needed disclosure of one more metric—the Unlevered Cash Flow Projections—to discover unrecognized value in their Vectren shares. The projections came from Vectren management, which had no motive to conceal the company's value.

This is the fundamental defect in plaintiffs' allegations of materiality. The materiality standard requires courts to assess the value of the omitted information in light of all the information made available to shareholders. Plaintiffs were therefore required to identify circumstances under which disclosure of the Unlevered Cash Flow Projections would plausibly have affected their votes for or against the merger, which would have required that those omitted numbers, if disclosed, would have shown that their Vectren shares were undervalued in the merger. Plaintiffs have not done so. Instead, as discussed above, plaintiffs argue that materiality is a question best resolved by the trier of fact. That may be true in many cases, but that general point does not answer the question in a particular case. We are not saying in the abstract that projected net income or loss or other numbers are inherently "better" or more material than projected cash flows. Rather, we are saying that in this case, plaintiffs' have not offered a plausible theory for treating the Vectren projected cash flows as material in light of all the other information provided to shareholders.

Plaintiffs rely on *Campbell v. Transgenomic, Inc.*, 916 F.3d 1121 (8th Cir. 2019), but the case is readily distinguishable based on the structure of the transaction and the nature of the omitted information. In *Campbell*, the acquiring company had agreed to pay for the target's shares not with cash but with the acquiring company's own stock. In such a transaction, the

Eighth Circuit held, whether the *acquiring* corporation's projected net income or loss was a material fact could not be determined at the motion to dismiss stage. *Id.* at 1125–26. In *Campbell*, Precipio, Inc. acquired Transgenomic, Inc. through a merger. Rather than an all-cash deal, like the CenterPoint acquisition of Vectren, Precipio offered Transgenomic shareholders an exchange of shares. *Campbell v. Transgenomic, Inc.*, 2018 WL 2063348, at *1 (D. Neb. May 3, 2018). The district and circuit court opinions in the case do not spell out all the choices available to Transgenomic shareholders, but at least one option was an exchange of shares at a ratio of 25.7505 to 1.00, later improved to 24.4255 to 1.00. *Id.* Since one option for the Transgenomic shareholders was to become Precipio shareholders, the financial health of Precipio was clearly material.

After the merger, a former Transgenomic shareholder sued under Section 14(a) alleging that the proxy statement "failed to give Transgenomic shareholders an accurate picture of Precipio's value." *Campbell*, 916 F.3d at 1124. The district court had dismissed for failure to state a claim, but the Eighth Circuit reversed. *Id.*

The Eighth Circuit held in relevant part that whether the omission of Precipio's own projected net income or loss made the proxy statement materially misleading could not be decided on a motion to dismiss. *Id.* at 1125–26. The court explained that it had long considered this particular metric—net income or loss—"to be among the three most valuable figures in determining the fairness of an acquisition under the Clayton Act." *Id.* at 1125, citing *Mississippi River Corp. v. FTC*, 454 F.2d 1083, 1086 (8th Cir. 1972). While the proxy statement disclosed gross profit projections for pre-merger Precipio, the

court found that "[b]y omitting the (allegedly) significantly lower projections for Precipio's net income/loss, the proxy statement may have presented Precipio in a false light that was materially misleading." *Id.*

Put simply, Transgenomic's disclosure of Precipio's projected gross profits did not resolve as a matter of law the materiality of the omission of Precipio's projected net profits or losses, at least where the plaintiff alleged that the disclosed projections significantly overvalued Precipio and the omitted projections showed or at least plausibly implied a significantly lower value for Precipio. *Id.* at 1125–26.

In such a stock-for-stock deal, the Eighth Circuit's reasoning is compelling. The merger terms here were quite different, however. Vectren's shareholders were not given the option of becoming CenterPoint shareholders in the merger. They were being offered only cash for their Vectren shares. If Merrill Lynch had undervalued Vectren shares, that would have been important to know, but plaintiffs have not actually alleged that, nor have they alleged or argued plausibly how the omission of the Unlevered Cash Flow Projections could have kept hidden a value in Vectren shares that was not otherwise disclosed. In other words, plaintiffs have not plausibly explained why Vectren's omission of the Unlevered Cash Flow Projections rendered the Proxy Statement materially misleading in light of all the information made available to shareholders. See *TSC Industries*, 426 U.S. at 449; *Basic, Inc.*, 485 U.S. at 231–32. Further, plaintiffs, unlike the plaintiff in *Campbell*, do not actually allege that the Consolidated Projections undervalued Vectren or that the company was worth more than the $72.00 per share paid in the merger. As persuasive as *Campbell* is on its facts, it is not apposite here.

### (b) *Independent Determination of Fair Value*

As a final note on materiality, we emphasize that share-holders are not entitled to the disclosure of every financial input used by a financial advisor so that they may double-check every aspect of both the advisor's math and its judgment. Section 14(a) is not a license for shareholders to acquire all the information needed to act as a sort of super-appraiser: appraising the appraiser's appraisal after the fact. E.g., *Beck*, 559 F.3d at 685 (shareholders' allegations that they "might have liked to have more backup information" were not enough to suggest "that any shareholder was misled or was likely to be misled" without it); see also *Skeen v. Jo-Ann Stores, Inc.*, 750 A.2d 1170, 1174 (Del. 2000) (rejecting claim that shareholders should be given all financial data necessary to make an independent determination of fair value); *In re 3Com Shareholders Litig.*, 2009 WL 5173804, at *2–3 (Del. Ch. Dec. 18, 2009) (rejecting claim for omission of financial projections because "adequate and fair summary of the work performed by [advisor] [was] included in the proxy"); *In re Trulia, Inc. Stockholder Litig.*, 129 A.3d 884, 900–01 & n.57 (Del. Ch. 2016) (collecting cases, including *Globis Partners, L.P. v. Plumtree Software, Inc.*, 2007 WL 4292024, at *12–13 (Del. Ch. Nov. 30, 2007), and *In re General Motors (Hughes) Shareholder Litig.*, 2005 WL 1089021, at *16 (Del. Ch. May 4, 2005), (stating that a "[fair] summary does not need to provide sufficient data to allow the stock-holders to perform their own independent valuation"), aff'd, 897 A.2d 162 (Del. 2006)).

After all, information made available to shareholders of a publicly traded company is also available to competitors. Courts need to be careful about requiring full public disclosure of sensitive internal financial information. See *Stroud v.*

*Grace*, 606 A.2d 75, 89 (Del. 1992) (noting that courts "must balance the board's duty to disclose all available material information in connection with the contemplated shareholder vote against its concomitant duty to protect the corporate enterprise"); *Alessi v. Beracha*, 849 A.2d 939, 947 (Del. Ch. 2004) (acknowledging that in some situations a corporation may not have to disclose material information to its shareholders in order to protect pre-merger negotiations). (We recognize that much of Vectren's business consisted of regulated monopoly public utility services. But other business segments faced competition, and even a public utility faces competition in buying needed goods and services.)

Plaintiffs also cite *Smith v. Robbins & Myers, Inc.*, 969 F. Supp. 2d 850 (S.D. Ohio 2013), a Section 14(a) case where shareholders sufficiently alleged the materiality of omitted metrics underlying a financial advisor's appraisal of share value. In *Smith*, the plaintiff alleged that the acquisition of Robbins & Myers by a company called NOVI was the product of a flawed process conducted in breach of defendants' duties under state law and obligations under Section 14(a). The plaintiff alleged that the Robbins & Myers board had, among other violations, permitted conflicted parties to control the sale process, relied on flawed financial analyses, and failed to inform itself adequately of the value of the company and the fairness of the merger terms. *Id.* at 866.

The district court held that the plaintiff had sufficiently alleged the materiality of omitted inputs and assumptions used to derive the discount rate employed by the target's financial advisor, Citi, in its discounted cash flow analysis. *Id.* at 871–72. The court reasoned that without the omitted information, shareholders "were unable to make any meaningful

determination whether that range reflected the Company's value or was the result of Citi's unreasonable judgment, and were unable to reject Citi's opinion that the Merger Consideration was fair to the Company's shareholders." *Id.* at 871.

The court acknowledged that other courts had dismissed shareholder claims seeking disclosure of similar metrics underlying a financial advisor's discounted cash flow analysis, but it distinguished the case at hand based on the problems in the bidding process. We have no such circumstances here. The *Smith* plaintiff had alleged that prior to receiving NOVI's offer, Citi and its competitor, UBS, had been using a lower weighted average cost of capital for Robbins & Myers in discounted cash flow analyses. After receiving NOVI's offer, however, plaintiff alleged, Citi used a grossly inflated weighted cost of capital in its discounted cash flow analysis, resulting in a significantly lower valuation of Robbins & Myers. 969 F. Supp. 2d at 871.

Here, we have no similar allegations that the merger between CenterPoint and Vectren was marred by bad faith, disloyalty, and disregard for shareholder value. The Vectren board conducted a competitive sale, and there is no plausible claim here of hidden and unappreciated value of the Vectren shares. The district court correctly concluded that plaintiffs failed to plausibly allege materiality of the omitted projections.

C. *Loss Causation*

Plaintiffs failed to state a viable Section 14(a) claim for a second and independent reason: failure to allege loss causation. Plaintiffs rely heavily on the Supreme Court's decision in *Mills* to show that they adequately alleged loss causation.

In doing so, however, plaintiffs confuse transaction causation with loss causation. Plaintiffs argue that loss causation is alleged sufficiently where a materially deficient proxy statement was an essential link in the consummation of a transaction that the plaintiff alleges caused him financial harm. But that is the test for transaction causation. See *Virginia Bankshares*, 501 U.S. at 1106–08 (where minority shareholders' votes were inadequate to ratify the merger, materially misleading proxy solicitation was not actionable because proxy solicitation was not an essential link in consummating the merger); *Mills*, 396 U.S. at 385 (holding that causation of damages by materially misleading proxy misstatement could be established by showing that proxy solicitation was an "essential link in the accomplishment of the transaction").

Neither *Mills* nor *Virginia Bankshares* used the term "transaction causation" in discussing a Section 14(a) plaintiff's burden on causation. As more recent securities cases have made clear, though, transaction causation and loss causation are different. Only transaction causation—not loss causation—may be summed up as "reliance." E.g., *Dura Pharmaceuticals*, 544 U.S. at 341–42 (citing "transaction causation" and "loss causation" as separate elements and describing "transaction causation" as "reliance"); *Ray v. Citigroup Global Markets, Inc.*, 482 F.3d 991, 995 (7th Cir. 2007) ("Transaction causation is nothing but proof that a knowledgeable investor would not have made the investment in question, had she known all the facts."); *Grace v. Rosenstock*, 228 F.3d 40, 47 (2d Cir. 2000) ("We have also noted that both loss causation and transaction causation must be proven in the context of a private action under § 14(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder.").

To plead loss causation, a Section 14(a) plaintiff must plead both economic loss and proximate causation. 15 U.S.C. § 78u-4(b)(4); *Dura Pharmaceuticals*, 544 U.S. at 342, 346; *New York City Employees' Retirement Sys. v. Jobs*, 593 F.3d 1018, 1023 (9th Cir. 2010); *Grace*, 228 F.3d at 46. The district court concluded that plaintiffs' allegations satisfied neither requirement. We do not proceed beyond the first step. Plaintiffs' failure to plead economic harm is fatal to their Section 14(a) claim.

Rather than alleging any actual economic harm, they allege that Vectren shareholders were impeded from realizing the scope of supposed economic harm. The argument goes something like this: if plaintiffs had been able to replicate Merrill Lynch's discounted cash flow analysis, they would have been able to determine that the actual value of their shares was higher than the $59.00 to $75.25 range of implied per share equity set forth in the Proxy Statement. How would plaintiffs have shown Vectren's undervaluation if given the chance to replicate Merrill Lynch's analysis? Plaintiffs allege that Merrill Lynch used too high a discount rate, 6.4 percent, which artificially deflated Vectren's value for purposes of the merger.

Plaintiffs calculated the alleged 6.4 percent discount rate by averaging the midpoints of the discount rate ranges provided for each business segment in the summary of the discounted cash flow analysis.[5] As evidence of this artificial

---

[5] The Proxy Statement disclosed the following discount rate ranges for each business segment, based on each segment's weighted average cost of capital: (i) 5.0 to 5.8 percent for the gas utility business (5.4 percent midpoint); (ii) 4.7 to 5.4 percent for the electric utility business (5.05 percent midpoint); and (iii) 7.8 to 9.6

deflation, plaintiffs include a Bloomberg chart in their amended complaint showing that Vectren's weighted average cost of capital for the first quarter of 2018 was 5.3 percent. Plaintiffs also allege that in March 2018, one month before the merger terms were agreed to, the website "Simply Wall Street" reported that "Vectren's earnings growth was expected to be in the teens in the upcoming years." Plaintiffs allege that such growth should presumably have led to robust cash flows, feeding into a higher share value.

We are not convinced. Behind plaintiffs' arguments concerning a supposedly inflated discount rate that supposedly deflated Vectren's valuation heading into the merger, the core of plaintiffs' allegations of economic injury is feeble. First, plaintiffs do not allege plausible error with the disclosed discount rate ranges. Plaintiffs only identify another possible discount rate, the Bloomberg rate. But as defendants point out, plaintiffs are silent as to how that 5.3 percent was calculated. In the end, plaintiffs' claim that Merrill Lynch used a flawed discount rate does not cross the line from possible to plausible. Plaintiffs are debating the merits of Merrill Lynch's choice of a discount rate and its judgment about the fair value of Vectren shares. That is a debate about the merits of the merger terms, not whether the Proxy Statement was misleading.

Second, plaintiffs' allegations amount—at most—to speculation that if the omitted metrics had been disclosed, they would have been able to determine that the value of their shares exceeded $72.00. Plaintiffs point out that in February 2018, Bidders A and B submitted indications of interest at

---

percent for the non-regulated business (8.7 percent midpoint). The unweighted mean of the three midpoints is 6.3833 percent.

prices above the final $72.00 price from CenterPoint. Again, the argument is incorrect.

Bidder B submitted a non-binding indication of interest at an all-cash price range of $73.00 to $75.00, but it declined to submit a binding offer. Bidder A's final offer proposed acquisition of Vectren for $71.00 per share paid with a mix of 83 percent cash and 17 percent common stock of Bidder A. Vectren's board specifically sought a transaction in which as much of the consideration as possible was cash. Plaintiffs attempt to reinforce their allegations of an inevitable superior offer by citing a "Simply Wall Street" projection that Vectren's standalone earnings growth was projected to be "in the teens" in the coming years. But without an allegation that Vectren turned down an available superior offer, that citation, too, invites only speculation.

Our decision in *Beck v. Dobrowski*, 559 F.3d 680 (7th Cir. 2009), is instructive on this point. In *Beck*, the plaintiff alleged that if it had not been for misleading proxy solicitations, shareholders of Equity Office Property Trust ("EO") would have rejected a proposed merger with Blackstone Group L.P., and in doing so, would have "reaped the economic benefits of continuing to own [EO] shares." *Id.* at 684. The plaintiff attempted to show these allegedly achievable economic gains by highlighting Vornado Realty Trust's offer of $56.00, supposedly superior to Blackstone's final all-cash offer of $55.50. Plaintiff's argument was flawed because the two offers were separated by less than one percent, and Blackstone could also pay the full price for EO on closing, while Vornado could not have completed the purchase unless and until its shareholders approved the acquisition, which would take months.

Also, and critically, Vornado had proposed acquiring EO at $56.00 per share, but proposed an initial cash tender offer for no more than 55 percent of EO's shares. 559 F.3d at 683. That was to have been followed by acquisition of remaining EO shares by swapping them with Vornado shares. We reasoned that a delay in several months of the receipt of 45 percent of the purchase price in Vornado stock reduced the present value of Vornado's offer by more than one percent. Also, the sale of EO for cash involved less risk than a sale in which almost half of the consideration would be paid in stock in the buyer. Indeed, we observed, EO's instinct had been rather prescient. In the months following the sale of EO to Blackstone, Vornado's stock plunged. Plaintiff's allegations of economic loss were therefore "heavy on hindsight and speculation, [and] light on verifiable fact." *Id.* at 684.

Here plaintiffs do not even allege the existence of a viable superior offer, making their allegations of economic loss even weaker than those in *Beck.* Because plaintiffs did not allege economic loss, the district court correctly determined that they failed to plead loss causation.[6]

The judgment of the district court is AFFIRMED.

---

[6] Plaintiffs also alleged claims under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), which imposes liability on persons who control other persons who are liable for violating the Exchange Act. Section 20(a) liability is derivative. Because plaintiffs' predicate Section 14(a) claim fails, their Section 20(a) claim necessarily fails.