**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 21-1571

SELWYN KARP, Individually and on Behalf of All Others Similarly Situated,

Plaintiff – Appellant,

and

CONSTANCE LAGACE, Individually and on Behalf of All Others Similarly Situated,

Plaintiff,

v.

FIRST CONNECTICUT BANCORP, INC.; JOHN J. PATRICK, JR.; RONALD A. BUCCHI; JOHN A. GREEN; JAMES T. HEALEY, JR.; PATIENCE P. MCDOWELL; KEVIN S. RAY; MICHAEL A. ZIEBKA,

Defendants – Appellees.

Appeal from the United States District Court for the District of Maryland, at Baltimore. Richard D. Bennett, Senior District Judge. (1:18-cv-02496-RDB; 1:18-cv-02541-RDB)

Argued:  March 9, 2023                              Decided:  June 1, 2023

Before DIAZ, THACKER, and HARRIS, Circuit Judges.

Affirmed by published opinion.  Judge Diaz wrote the opinion, in which Judge Thacker and Judge Harris joined.

**ARGUED:** Juan Eneas Monteverde, MONTEVERDE & ASSOCIATES, PC, New York, New York, for Appellant. Robert R. Long, IV, ALSTON & BIRD, LLP, Atlanta, Georgia, for Appellees. **ON BRIEF:** Elizabeth Gingold Clark, Timothy J. Fitzmaurice, ALSTON & BIRD, Atlanta, Georgia, for Appellees. G. Stewart Webb, Jr., Elizabeth C. Rinehart, VENABLE LLP, Baltimore, Maryland, for Appellee First Connecticut Bancorp, Inc.

———————

DIAZ, Circuit Judge:

Selwyn Karp contends that First Connecticut Bancorp, Inc. and its directors violated the securities laws by misleading shareholders like him about the true value of their shares ahead of a stock-for-stock merger. To comply with Section 14(a) of the Securities Exchange Act of 1934, Karp claims, First Connecticut needed to disclose specific cash-flow projections—and particularly an earlier, rosier set of projections—in the proxy statement it circulated to investors.

The district court granted First Connecticut's motion for summary judgment, holding that Karp hadn't shown that (1) the cash-flow projections were material; (2) their omission caused him any economic loss; or (3) the directors acted negligently in approving the proxy statement. Finding no reversible error, we affirm.

I.

A.

First Connecticut and People's United Financial, Inc. proposed a merger to their shareholders in June 2018. Under the merger agreement, First Connecticut shareholders would receive 1.725 shares of People's United stock for each share of First Connecticut stock they held. That exchange ratio reflected an implied cash value of around $32.33 per First Connecticut share—a 24.3% premium over the stock's closing price on the day the merger was announced. First Connecticut's financial advisor, Piper Jaffray & Co., had advised the bank's Board that the merger consideration was fair.

3

First Connecticut filed a merger proxy statement with the SEC and disseminated it to shareholders. The proxy statement ran over 150 pages, including ten pages summarizing the different financial analyses Piper Jaffray performed in developing its fairness opinion. One of those analyses was a "discounted cash flow" analysis, which "estimate[d] a range of the present values of after-tax cash flows that First Connecticut could provide to equity holders through 2023 on a stand-alone basis." J.A. 65.63. The proxy statement noted that Piper had used two years of publicly available earnings estimates in its analysis, and applied an 8% earnings growth rate to estimate discounted cash flow for several other years. It didn't disclose the specific cash-flow figures used in the analysis.

But about seven months earlier, while First Connecticut was exploring a merger with a different bank, Piper presented another set of cash-flow projections to the Board. These November 2017 cash-flow projections were more optimistic than the estimates used for the fairness opinion. But they were prepared without input from the bank's management: A Piper director who worked on the earlier projections testified that he hadn't consulted First Connecticut on them, and that they weren't "tied back to anything but my industry knowledge." J.A. 1129.

Unaware of the earlier projections, First Connecticut's shareholders voted to approve the merger.

### B.

Karp, a First Connecticut shareholder, filed a putative class action against First Connecticut and its individual directors. The operative amended complaint alleges that First Connecticut and its directors violated Sections 14(a) and 20(a) of the Securities

4

Exchange Act of 1934, as well as SEC Rule 14a–9, because the proxy statement didn't include the cash-flow figures Piper used in its analysis. In Karp's view, the cash-flow projections (particularly the November 2017 figures) painted a more optimistic picture of First Connecticut's financials—a picture First Connecticut then hid from shareholders, leading them to undervalue their shares and approve the merger.

1.

Discovery began and the parties hired experts. Karp submitted a report by financial analyst M. Travis Keath. In the report, Keath stated that the decrease in projected cash flow between November 2017 and June 2018 (when Piper Jaffray prepared the fairness opinion) didn't make sense, since other metrics showed that First Connecticut's financial situation was improving. Based on the earlier projections, Keath calculated the fair value of First Connecticut's stock to be $35.51 per share—$3.18 more than the merger price. Keath concluded that the proxy statement's omission of the projected cash-flow figures "was an inappropriate omission of information material to the decision facing [First Connecticut's] shareholders." J.A. 794. But in his deposition, Keath clarified that he had no opinion about whether the omission caused the shareholders any damages.

First Connecticut offered expert opinions from Dr. L. Adel Turki and Jonathan Foster. Turki, a senior managing director at an economic consulting firm, examined proxy statements from 44 comparable bank mergers to determine whether they disclosed cash-flow projections. He found that such projections were included in only one of the 44 proxy

5

statements.[1] Turki also stated that nondisclosure of the cash-flow projections couldn't have caused the shareholders economic harm. People's United was "willing to walk" if First Connecticut didn't accept the $32.33-per-share deal, so disclosing the projections wouldn't have resulted in higher merger consideration. J.A. 1269 & n.71 (citing J.A. 1180 (deposition of People's United CEO)). And considering "contemporaneous market evidence," there was "no reason to believe" that disclosure of the projections "would have caused a majority of First Connecticut shareholders to vote against the Merger." J.A. 1269.

Foster, the founder of a merger-advisory firm, opined that the First Connecticut directors acted consistently with industry practice in their review and approval of the proxy statement. He noted that Board members rarely draft proxy statements, attempt to verify statements or analyses in them, or evaluate whether financial information (like the cash-flow projections) should be included. Karp didn't submit a rebuttal to Foster's report.

2.

Karp moved for summary judgment. First Connecticut opposed Karp's motion and cross-moved for summary judgment. First Connecticut also moved to exclude Keath's opinions and testimony.

The briefing schedule stipulated that Karp had until April 9 to file a reply in support of his motion and opposing First Connecticut's. But on that day—before Karp filed his

---

[1] Keath submitted a rebuttal to Turki's report, arguing (among other things) that Turki erred in including only bank mergers in his dataset. In Keath's opinion, the banking industry has a "dismal track record of providing" cash-flow projections to shareholders, but other corporations more often provide this information. J.A. 1216.

6

reply—the district court issued an opinion and order denying Karp's motion and granting First Connecticut's.

Reviewing each motion separately, the district court held that there was no genuine dispute of material fact about the main requirements for Karp's Section 14(a) claim. First, the court held, "[n]o reasonable jury could find from the evidence put forward by [Karp] that omission of the cash flow projections was material." *Karp v. First Conn. Bancorp, Inc.*, 535 F. Supp. 3d 458, 469 (D. Md. 2021). It noted that Karp hadn't offered "any evidence that a single First Connecticut shareholder was misled by the Merger Proxy, believed the projections were material, or generally felt that the information provided in the Merger Proxy was inadequate." *Id.* at 470. (In fact, Karp himself admitted that he couldn't remember whether he had voted for or against the merger, much less what information he consulted to decide.) And given Turki's undisputed testimony that cash-flow projections were disclosed in only one of 44 comparable bank mergers, the court observed that finding materiality "would fly in the face of regular practice." *Id.*

Second, the district court held that Karp hadn't shown a "genuine dispute of material fact relevant to the issue of loss causation," which "requires a showing of a causal connection between the material misrepresentation and the loss." *Id.* at 471 (cleaned up). In other words, Karp failed to show "how the omission of the cash flow projections actually caused [the purported] $3.18 per share loss." *Id.* at 472. The court noted that there was no evidence that the stock was traded in an inefficient market, nor that any other company would have paid more than $32.33 had the shareholders rejected the merger. Nor had Karp

7

shown that the shareholders would have rejected the merger even if the cash-flow projections were included.

Finally, the court held that Karp failed to establish that First Connecticut or its directors were negligent in assessing the proxy statement. The court noted a split in authority on the level of culpability required to establish Section 14(a) liability: Some courts have required only negligence, while others "have required something more, at least for certain categories of defendants." *Id.* at 468–69 (quoting *In re Willis Towers Watson plc Proxy Litig.*, 937 F.3d 297, 308 (4th Cir. 2019)). But even assuming negligence was the correct standard, the court held, Karp "provided no evidence that the Board of Directors failed to exercise reasonable care, nor [] alleged what the applicable standard of care in this case would be." *Id.* at 474. And Foster's unrebutted testimony supported that the directors acted consistent with industry practice.

Finding that First Connecticut was entitled to summary judgment on the Section 14(a) claim, the court also entered judgment on Karp's Section 20(a) claim. The court explained that Section 20(a), which provides for "controlling person liability," must be based on a primary violation of the securities laws. *Id.* at 475. And since Karp failed to establish his Section 14(a) claim, no primary violation existed here.

The district court entered judgment for First Connecticut and denied other pending motions (including the bank's motion to exclude Keath's expert testimony and Karp's motion to certify the class) as moot.

This appeal followed.

8

II.

Before us, Karp argues that the district court deprived him of due process by issuing its opinion before he could respond to First Connecticut's cross-motion for summary judgment. And in the alternative, he argues that genuine issues of material fact exist about materiality, causation, and negligence. We disagree with both contentions.

A.

We begin with Karp's procedural objection. Karp claims we must reverse the district court's order because "he had no opportunity to contest" First Connecticut's cross-motion. Appellant's Br. at 10. Karp objects to the district court's decision to issue its opinion and order on April 9, the last day (per the briefing order) that he could respond. First Connecticut responds that Karp forfeited the issue by failing to raise it in the district court. And in any case, it argues, any alleged error was harmless because Karp didn't identify any extra evidence he would have submitted if given the chance.

As a threshold matter, we decline to find that Karp forfeited his objection to the district court's fast-tracked ruling by not raising it below. First Connecticut's argument on this point relies on a footnote in *Amzura Enterprises v. Ratcher*, 18 F. App'x 95, 105 n.10 (4th Cir. 2001) (argued but unpublished). In that case, the district court invited a party to move orally for summary judgment and granted the motion after a brief argument. The other parties didn't object to the "expedited grant of summary judgment" at the hearing, which we noted "waived their procedural challenges." *Id*. But while that rule might make sense for parties who remain silent at a surprise summary-judgment hearing, it's less clear

9

what Karp should have done to object here, where the district court entered an order before briefing had concluded and without any notice to the parties.

We agree with First Connecticut, however, that any error the district court committed was harmless. While neither party offers a case directly on point, we have addressed other allegations that a district court prematurely granted summary judgment. These opinions guide us here.

Under Federal Rule of Civil Procedure 56(f), for example, a court may grant summary judgment sua sponte after giving parties "notice and a reasonable time to respond." That is, the court "must, in view of the procedural, legal, and factual complexities of the case, allow the party a reasonable opportunity to present all material pertinent to the claims under consideration." *U.S. Dev. Corp. v. Peoples Fed. Sav. & Loan Ass'n*, 873 F.2d 731, 735 (4th Cir. 1989). We've reviewed a district court's decision to expedite a summary-judgment decision under this Rule for harmless error. *See Amzura Enterprises*, 18 F. App'x at 104; *see also Fender v. Gen. Elec. Co.*, 380 F.2d 150, 152 (4th Cir. 1967).

On this record, we conclude that Karp had a "full and fair opportunity to present [his] case." *Moore v. Equitrans, L.P.*, 27 F.4th 211, 224 (4th Cir. 2022). In his motion for summary judgment, he submitted a statement of 100 uncontested facts, a memorandum of law, and 28 exhibits. And Karp doesn't identify any specific evidence on materiality or loss causation that he was saving for his response brief: He only suggests vaguely that he planned to "refer[] the District Court to additional factual evidence and testimony." Appellant's Br. at 26; *see Amzura*, 18 F. App'x at 104 (finding harmless error when the

10

party opposing summary judgment didn't "point[] to any additional evidence, beyond conclusory allegations, that they might have offered").

Karp argues that the district court's expedited order "denied [him] his right to have competing inferences resolved in his favor," so it can't be excused as harmless error. Appellant's Br. at 11 (citing *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003)). But as described more fully below, there's no indication that the district court misapplied the summary-judgment standard in reviewing First Connecticut's motion.

Karp also contends that he planned to move to exclude First Connecticut's experts under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Karp's briefs don't explain why the expert evidence was inadmissible. But even if the motion would have had merit, any error in admitting the evidence was harmless. *See Wickersham v. Ford Motor Co.*, 997 F.3d 526, 531–32 (4th Cir. 2021) (evaluating admission of expert opinion for harmless error).

The district court's opinion doesn't suggest that First Connecticut's expert opinions were integral to its conclusions on materiality and loss causation. Rather, the court concluded that Karp's evidence on these elements fundamentally fell short—a conclusion that was only bolstered by First Connecticut's expert testimony. *See Karp*, 535 F. Supp. 3d at 470, 472–73. Given the fatal gaps in Karp's evidence, we have "fair assurance that the judgment was not substantially swayed" by admitting the reports. *Wickersham*, 997 F.3d at 532 (cleaned up).

11

We advise district courts to adhere to the briefing schedule to avoid disputes like these. But in this case, we perceive no reversible error in the district court's accelerated ruling.

B.

Onto the merits. We review a district court's grant of summary judgment de novo, resolving factual disputes and drawing inferences in the light most favorable to the nonmoving party, Karp.[2] *Ga. Pac. Consumer Prods., LP v. Von Drehle Corp.*, 618 F.3d 441, 445 (4th Cir. 2010). "Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *French v. Assurance Co. of Am.*, 448 F.3d 693, 700 (4th Cir. 2006).

Here, we're asked to determine whether there is a genuine dispute of material fact about any of the elements of Karp's Section 14(a) claim. We agree with the district court that there isn't.

Section 14(a) authorizes the SEC to adopt rules for proxy solicitations and prohibits their violation. *See* 15 U.S.C. § 78n(a). The SEC's Rule 14a–9, in turn, prohibits proxy statements that are "false or misleading with respect to any material fact," including statements that omit "any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a–9(a). Private plaintiffs may enforce violations through class actions. 15 U.S.C. § 78u-4.

---

[2] Karp doesn't appeal the denial of his own summary-judgment motion.

To prevail in a private cause of action asserting a violation of Section 14(a) and Rule 14a–9, "a plaintiff must show that (1) the proxy statement contained a material misrepresentation or omission (2) that caused the plaintiff injury and that (3) the proxy solicitation was an essential link in the accomplishment of the transaction." *Hayes v. Crown Cent. Petroleum Corp.*, 78 F. App'x 857, 861 (4th Cir. 2003) (per curiam) (argued but unpublished).  The second and third elements have been termed "loss causation" and "transaction causation," respectively.  *See Grace v. Rosenstock*, 228 F.3d 40, 47 (2d Cir. 2000).

In addition, the facts must give rise "to a strong inference that the defendant acted with the required state of mind," though the Supreme Court and this circuit have so far declined to determine what that state of mind is.  15 U.S.C. § 78u-4(b)(2)(A); *see Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1090 n.5 (1991); *Willis Towers*, 937 F.3d at 308.

The district court found that Karp hadn't shown a genuine issue of material fact about materiality and loss causation (no one disputes transaction causation), nor about the defendants' state of mind.  We affirm the district court's grant of summary judgment on the first two grounds, so we find it unnecessary to reach the third.

1.

There's one issue at the outset.  In First Connecticut's view, Karp pleaded in his complaint that the proxy statement's omission of any specific cash-flow projections violated Section 14(a).  But at summary judgment, First Connecticut argues, Karp "appear[ed] to pivot" and suggest that the proxy statement was misleading specifically

13

because it omitted the November 2017 cash-flow projections. Appellees' Br. at 17. First Connecticut accuses Karp of improperly "rais[ing] a new claim through argument on summary judgment." *Id.*

But we agree with Karp that his complaint fairly encompasses this theory. The complaint contends that First Connecticut violated the securities laws by omitting "*any form* of First Connecticut's after-tax cash flow projections." J.A. 25 (emphasis added). First Connecticut's out-of-circuit authorities on the issue involve plaintiffs who "wholly abandon[ed]" their complaint-stage theories, *In re St. Jude Med., Inc., Sec. Litig.*, 629 F. Supp. 2d 915, 921 (D. Minn. 2009), or "significantly expand[ed]" their claim "as well as the resulting discovery," *In re Molycorp, Inc. Sec. Litig.*, No. 12-cv-00292, 2016 U.S. Dist. LEXIS 71087, at *17 (D. Colo. May 25, 2016).

By contrast, Karp has always focused on the omission of cash-flow projections—and if anything, his focus on the November 2017 projections narrows the claim. The district court accounted for the November figures in its summary-judgment opinion, *see Karp*, 535 F. Supp. 3d at 464–65, and we follow suit.

### 2.

On materiality, Karp contests the district court's holding that the "[o]mission of the cash flow projections was not material as required under Section 14(a)." *Id.* at 469. "A fact is material if there is a substantial likelihood that the disclosure of the fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Willis Towers*, 937 F.3d at 304 (cleaned up). Put another way, an omitted fact is material if it's substantially likely "that a reasonable shareholder

14

would consider it important in deciding how to vote." *TSC Indus. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).

Karp argues that cash-flow projections would have "showed that the Merger consideration was inadequate, and that Piper Jaffray's valuation was skewed," so a reasonable investor would have found them important to their vote. Appellant's Br. at 15. First Connecticut responds that it's not enough to speculate that shareholders might have found the projections helpful to the deliberations, so long as the merger proxy "provided a thorough and accurate summary" of the financial advisor's work. Appellees' Br. at 19. We agree with First Connecticut.

The Seventh Circuit's decision in *Kuebler v. Vectren Corp.*, 13 F.4th 631 (7th Cir. 2021), is instructive. There, shareholders alleged that a proxy statement for an all-cash merger wrongly omitted a metric called "Unlevered Cash Flow Projections," which "forecast the gross after-tax cash flow" for the merging company. *Id.* at 634. The district court dismissed the complaint for failure to state a claim, and the Seventh Circuit affirmed.

The court held that the cash-flow projections were immaterial as a matter of law "given all the other information provided." *Id.* at 641. It noted that the proxy statement disclosed a wealth of information and, though plaintiffs asserted that unlevered cash flow was "superior[] . . . as a measure of a company's intrinsic value, [] superiority is not synonymous with materiality." *Id.* And it emphasized that "shareholders are not entitled to the disclosure of every financial input used by a financial advisor so that they may double-check every aspect of both the advisor's math and its judgment." *Id.* at 643–44; *see also id.* at 644 ("Section 14(a) is not a license for shareholders to acquire all the

15

information needed to act as a sort of super-appraiser."); *Malon v. Franklin Fin. Corp.*, No. 14CV671, 2014 WL 6791611, at *7 (E.D. Va. Dec. 2, 2014) ("Stockholders are not entitled to the extensive financial data necessary to recreate the financial advisor's determination of fair value.").

In arriving at its conclusion, the Seventh Circuit considered an affidavit from plaintiffs' expert, Keath, who is also Karp's expert. The court found that Keath's affidavit "generally support[ed] plaintiffs' position that shareholders would have liked to have more information rather than less." *Kuebler*, 13 F.4th at 637. But it didn't help plaintiffs "explain why any shareholder was actually or likely to have been misled by the omission of the [cash-flow metric] in light of all the other information provided to shareholders in the Proxy Statement." *Id*.

Though this case involves a stock-for-stock merger at the summary-judgment stage, the Seventh Circuit's reasoning is persuasive. As in *Kuebler*, the proxy statement here contained a bevy of information, including projections of total assets, net assets, returns on average assets and tangible common equities, and earnings per common share. Indeed, Karp notes that First Connecticut's 2018 net income projections show "improving financial prospects." Appellant's Br. at 23. Two years of those projections are disclosed in the proxy statement—so it's not clear why Karp needed the cash-flow projections to confirm the trend.

The proxy statement also included the results of several other analyses that Piper Jaffray performed, all of which concluded that the $32.33 merger price was within or above the estimated valuation range. Given the array of metrics in the proxy statement, we find

16

it unlikely that the November cash-flow projections would have "significantly altered the total mix of information." *Willis Towers*, 937 F.3d at 304.

Karp claims the district court overlooked two key sources of evidence. First, Karp testified that cash-flow projections are important because "they showed First Connecticut was expected to have 'very large growth,'" and thus the proxy statement "didn't give the whole picture of the financial aspects" of the merger. Appellant's Br. at 15 (cleaned up). Second, Keath's expert report and testimony "objectively explaine[d] why cash flows would have been important to the hypothetical reasonable investor." *Id*. at 17 (cleaned up).

As in *Kuebler*, however, Karp's evidence doesn't offer "a plausible theory for treating the [] projected cash flows as material in light of all the other information provided to shareholders." 13 F.4th at 642. Karp testified that cash flows are "one of the things that [he] considered important," that they "would have given [him] a better picture," and that they "would have told [him] what growth was forthcoming." J.A. 1016, 1020, 1036. But he didn't testify that the cash-flow projections would have actually "affected [his] vote for or against the proposed merger." *Kuebler*, 13 F.4th at 641. Indeed, Karp didn't remember whether he had voted for or against the merger, whether he had voted at all, or what information he would have relied on.

Karp criticizes the district court for citing this testimony, arguing that the court "appears to have mistakenly believed that proving materiality requires proving reliance." Appellant's Br. at 19. But that's not a fair characterization of the district court's opinion. And while the standard refers to a "reasonable shareholder," *TSC Indus.*, 426 U.S. at 449,

17

it's at least relevant that the lead plaintiff in this case didn't even look for the cash-flow projections.

Nor do Keath's expert report and testimony fill the gap. In his report, Keath stated that omitting the projections left shareholders unable "to calculate [First Connecticut's] cash flows for themselves," so they were "unable to critically review" Piper's fairness opinion. J.A. 779. And in his deposition, he echoed that "[t]he proxy statement did not include sufficient information to enable shareholders to know even what the cash flows were, let alone to discern what problems might exist [] regarding those projections." J.A. 1063. But as other courts have held, shareholders aren't entitled to "double-check every aspect of [] the advisor's math" so long as the proxy statement contains an "adequate and fair" statement of their work. *Kuebler*, 13 F.4th at 644 (cleaned up); *see also In re Trulia, Inc. S'holder Litig.*, 129 A.3d 884, 901 (Del. Ch. 2016) ("[T]he summary does not need to provide sufficient data to allow the stockholders to perform their own independent valuation."). Keath's testimony likewise fails to explain why the cash-flow projections would have altered the total picture "in light of all the other information provided to shareholders in the Proxy Statement." *Kuebler*, 13 F.4th at 637.

In all, we agree with the district court that no reasonable jury could find the omission of the cash-flow projections material, so the court correctly granted summary judgment on this basis.

3.

Even if the proxy statement were misleading, First Connecticut is also entitled to summary judgment for a second reason: there's no genuine issue of material fact relevant

18

to loss causation. In a private Section 14(a) action, a plaintiff must "prove that the defendant's misrepresentation (or other fraudulent conduct) proximately caused the plaintiff's economic loss." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346 (2005); *see* 15 U.S.C. § 78u-4(b)(4). That proof was lacking here, said the district court, because there was "no evidence that First Connecticut shareholders would have received $35.51 per share for their stock"—Karp's proffered fair value—"if the cash flow projections had been disclosed." *Karp*, 535 F. Supp. 3d at 473.

Karp contends that "loss causation is satisfied because the deficient proxy [was] a proximate cause of the damages"—that is, the proxy statement was an "essential link in a financially unfair merger." Appellant's Br. at 39. First Connecticut says that more is needed: Karp "must tie the misleading proxy statements directly to the economic harm" by showing that omission of the projections "prevented First Connecticut shareholders from receiving $35.51 per share for their stock." Appellees' Br. at 25–26. First Connecticut argues that Karp failed to show that disclosure of the projections would have either (1) caused another buyer to pay more than $32.33 per share, or (2) caused shareholders to reject the merger, and (in that case) that the share price on the day of the merger would have been $35.51. We again agree with First Connecticut.

As the district court explained, Karp hasn't shown that the omission of the November 2017 cash-flow projections caused a $3.18 per share loss. For one, First Connecticut's stock was trading at $26 per share the day before the merger was announced, well below the merger consideration of $32.33. And Karp doesn't suggest that the shareholders missed out on "a viable superior offer" by approving the merger. *Kuebler*, 13

19

F.4th at 647. On the contrary, People's was "willing to walk" if First Connecticut rejected the $32.33 offer, and no other offer was on the table. J.A. 1180. So it's unclear how the shareholders would have realized the $35.51 price had the proxy statement included the cash-flow projections—or whether they even would have rejected the merger in that case. *Cf. Gray v. Wesco Aircraft Holdings, Inc.*, 847 F. App'x 35, 37 (2d Cir. 2021) (dismissing complaint where plaintiffs didn't allege that earlier, more optimistic share-price projections "were sufficiently likely, or that shareholders faced a genuine choice between the Merger and the achievement of the Initial Projections" (cleaned up)).

Karp argues that most courts (including the district court) "have botched the Section 14(a) causation analysis." Appellant's Br. at 32. He contends that in Section 14(a) cases, loss causation and transaction causation are "inextricably linked and essentially identical concepts." *Id*. So rather than proving that the omission of the cash-flow statements caused his economic loss, he argues, he only needs to show that First Connecticut's misleading proxy statement proximately caused the *merger*.

Karp relies on two Supreme Court cases, *Mills v. Electric Auto-Lite Co.* and *Virginia Bankshares, Inc. v. Sandberg*, to support his position. In *Mills*, the Court held that "a shareholder has made a sufficient showing of causal relationship between the violation and the injury" if he proves that the proxy solicitation "was an essential link in the accomplishment of the transaction." 396 U.S. 375, 385 (1970). And in *Virginia Bankshares*, the Court reiterated that *Mills* "addressed the sufficiency of proof that misstatements in a proxy solicitation were responsible for damages claimed from the merger." 501 U.S. at 1099.

20

But both cases were decided before Congress enacted the Private Securities Litigation Reform Act of 1995 (PSLRA), which imposed the loss-causation requirement. *See Stoneridge Inv. Partners v. Sci.-Atlanta*, 552 U.S. 148, 165 (2008). Today, *Mills* and *Virginia Bankshares* are best understood as defining the test for transaction causation, not loss causation. *See Kuebler*, 13 F.4th at 645.

"Transaction causation, often called reliance, is generally easier to establish than loss causation"—it requires only a showing that the proxy statement was an essential link in the transaction. *Kuebler*, 13 F.4th at 637–38. But loss causation requires that a plaintiff "prove that the challenged misrepresentations or omissions caused her economic loss." *Id*. at 638. And post-PSLRA, the Supreme Court has repeatedly emphasized that the two elements are distinct. *See, e.g.*, *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 812 (2011); *Dura Pharms.*, 544 U.S. at 341–42. Though *Erica P. John Fund* and *Dura Pharmaceuticals* dealt with Section 10(b) claims, we join our sister circuits in finding their reasoning applicable to Section 14(a) claims. *See Grace*, 228 F.3d at 46; *Kuebler*, 13 F.4th at 638 n.1; *N.Y.C. Emps.' Ret. Sys. v. Jobs*, 593 F.3d 1018, 1023 (9th Cir. 2010), *overruled in part on other grounds by Lacey v. Maricopa Cnty.*, 693 F.3d 896 (9th Cir. 2012).

Karp's evidence doesn't establish that he or any other shareholder suffered an economic loss because the cash-flow projections weren't in the proxy statement. So the district court correctly granted summary judgment on this basis as well.[3]

4.

Finally, we affirm the district court's grant of summary judgment for the individual defendants on Karp's Section 20(a) claim.

Section 20(a) of the Exchange Act provides that "controlling persons" can be vicariously liable for violations of the securities laws. *See* 15 U.S.C. § 78t. But a claim "under Section 20(a) must be based upon a primary violation of the securities laws," and for the reasons above, we agree that Karp has established no such violation here. *Svezzese v. Duratek, Inc.*, 67 F. App'x 169, 174 (4th Cir. 2003). So this claim too fails.

*AFFIRMED*

---

[3] Given our holding, we decline to reach Karp's argument that the district court erred in holding that he failed to establish negligence on the part of First Connecticut and its directors. We likewise decline to address First Connecticut's alternative argument that the safe-harbor provisions of the PSLRA apply.