


FILED

Aug 01 2025, 10:20 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

IN THE

# Court of Appeals of Indiana

Safron Capital Corporation, and The General Retirement System of the City of Detroit, Individually and on Behalf of All Others Similarly Situated,

*Appellants-Plaintiffs*

v.

Elanco Animal Health Incorporated, et al,

*Appellees-Defendants*

---

August 1, 2025

Court of Appeals Case No.
24A-CT-1164

Appeal from the Marion Superior Court, Indiana Commercial Court

The Honorable Christina R. Klineman, Judge

Trial Court Cause No.
49D01-2010-CT-036760

---

**Opinion by Judge Felix**
Judges Pyle and Weissmann concur.

**Felix, Judge.**

## Statement of the Case

Shortly before a January 2020 public offering of securities (the "Offering"), Elanco Animal Health Inc. began implementing changes to its distribution strategy for the companion animal segment of its business. Soon after the Offering concluded, Elanco publicly revealed for the first time its distribution changes. A few months later, Elanco reported revenue decreases for the first quarter of 2020. Consequently, Safron Capital Corp. and others who purchased securities in the Offering (collectively, the "Investors") sued Elanco and others (collectively, the "Offerors") for alleged violations of federal securities law in connection with that offering. Elanco filed a motion to dismiss the Investors' complaint pursuant to Indiana Trial Rule 12(B)(6), which the trial court granted. The Investors now appeal and raise one issue for our review, which we revise and restate as the following two issues:

1. Whether the trial court erred by dismissing the Investors' complaint under Trial Rule 12(B)(6); and
2. Whether the trial court erred by not addressing the Investors' preemptive request for leave to amend their complaint if the trial court granted the motion to dismiss.

We affirm.

## Facts and Procedural History

The facts described herein are primarily those alleged by the Investors in their Second Amended Complaint.

[4]     Elanco is a publicly traded animal health company located in Greenfield, Indiana. Elanco develops, manufactures, and markets products in two segments of the animal health industry: (1) Companion Animal and (2) Food Animal. Elanco's Companion Animal products fall into two primary categories: (1) disease prevention and (2) therapeutics. In 2019, Elanco's Companion Animal segment accounted for approximately 37% of its total revenue. Elanco primarily sold its Companion Animal products to eight third-party distributors, and in 2019, the largest of those eight distributors accounted for approximately 13% of Elanco's total revenue.

[5]     On August 20, 2019, Elanco announced it had entered an agreement to purchase Bayer Aktiengesellschaft's animal health business for approximately $7.5 billion, which Elanco stated would make it the second largest animal health company in the world and would likely double its total annual revenue. On January 10, 2020, in a press release regarding its initial financial guidance for 2020, Elanco projected its total revenue would be in the range of $3.05 to $3.11 billion and stated, "the Bayer transaction . . . is developing even better than originally expected in August." Appellants' App. Vol. II at 115. During an earnings call that same day, Elanco's chief executive officer ("CEO") stated in relevant part that "the biggest change going into 2020 is our holistic approach, looking at channels, both in the clinic and retail. Again, we have a retail group looking at how we're going to utilize distribution in a more targeted way, value-based way, certain portfolio against certain segments." *Id.*

To raise part of the funds needed to pay the $7.5 billion purchase price of Bayer's animal health business, Elanco decided to make a public offering of common shares and equity units. To that end, on January 21, 2020, Elanco filed a registration statement[1] with the SEC; the same day, Elanco filed its preliminary prospectuses[2] with the SEC, which it amended and supplemented by final prospectuses that it filed with the SEC three days later. The prospectuses incorporated the registration statement, and together these documents constituted the Offering Documents. On January 27, 2020, the Offering concluded; in total, Elanco sold approximately 25 million shares of common stock and 11 million equity units, resulting in approximately $1.3 billion in net proceeds.

On February 19, 2020, Elanco's CEO stated in an earnings call that Elanco had "cut [its] distribution down to four major distributors" in its Companion Animal segment prior to the Offering "to achieve a 'targeted approach'" that it "set up" for 2020. Appellants' App. Vol. V at 123. According to Elanco's CEO, "a lot of analysis was done in putting this strategy together. And we do not see disruption in the year, still yet to be seen as disruption in the quarter," *id.*; the CEO further stated that Elanco would "be monitoring this month-to-month as we look at it. But we feel very good about [the] distribution strategy.

---

[1] 15 U.S.C. §§ 77b(a)(8), 77f, 77aa.

[2] *Id.* §§ 77b(a)(10), 77j.

Distributors are key and again, a very value-based approach as we move forward," *id.* at 124.

[8]     Also during this call, Elanco's CEO asserted that Elanco had "not seen a material impact" on "local logistics and the ability to move products throughout China" due to COVID-19. Appellants' App. Vol. V at 127. At that time, Elanco had not experienced any significant interruptions in "product flows into the market," which it attributed to having "safety stock throughout our supply chain, that enables us to minimize impacts from short-term supply disruptions." *Id.* Less than one week later, Elanco's chief financial officer reiterated that Elanco was not having supply chain issues because of COVID-19, and stated in relevant part:

> [Elanco] carr[ies] a lot of inventory . . . . And so with that, we have no issues with respect to supply chain or API in 2020. Obviously, if it became a much longer [term], then we'd have to think about what that means. We've got . . . somewhere in the 8 to 9 contract manufacturers in China. So of the 90 contract manufacturers we have, a small part's in China and they don't dedicate themselves 100% to use by any stretch. It may be that we're set up to have our run of product in August. Okay, well, if that gets pushed to December, it's probably not going to be the end of the world. It gets pushed to August of 2021, all right, then we have to think about it. But overall, we don't think there's an impact on us from a supply chain perspective.

> *Id.* at 128 (emphasis omitted) (alterations in original).

[9]     On March 11, 2020, the World Health Organization declared COVID-19 a pandemic. Five days later, Indiana reported its first COVID-19 death, and on

March 23, Indiana Governor Eric Holcomb issued a stay-at-home order. On March 31, Elanco's first quarter of 2020 ended.

[10] On May 7, 2020, Elanco released its financial results for the first quarter of 2020; it reported $657.7 million in quarterly revenue, which was a $60 million—or 9%—decline. In a press release accompanying this report, Elanco attributed the decline in revenue to, among other things, "distributor performance." Appellants' App. Vol. V at 125. Elanco noted that it had "made initial progress to meaningfully reduce channel inventory" of its Companion Animal third-party distributors. *Id.* Elanco's CEO stated this reduction in inventory was "to tighten [Elanco's] approach across . . . [its] distributor relationships" and "drive demand for [Elanco's] products over the long term." *Id.* (all but first alteration in original).

[11] During an earnings call that same day, Elanco's CEO stated that Elanco had "consolidated our U.S. Companion Animal distributors from 8 to 4" at the beginning of 2020, and it "instituted specific targets for [those four distributors] to generate end-customer demand." Appellants' App. Vol. V at 126. Elanco's CEO noted that the distributors' "ability to generate demand is much less effective than our own, especially in generating new clinic placements for our products." *Id.* Additionally, Elanco's CEO detailed the new distribution strategy for its Companion Animal products in relevant part as follows:

> Consequently, in Q1, we reduced the amount of product and distributor inventory by approximately $60 million, mainly in the U.S. companion animal space. And we expect to further reduce

an additional $80 million to $100 million, mainly in the second quarter, as we apply these new tactics across our business and geographies. The evaluation of our distributors was a priority, as I took primary responsibility for our U.S. operations last December. With the insights gained into distributors' capabilities and broader actions that drive demand as well as the upcoming close on the Bayer acquisition, I'm excited by the changes in Elanco's commercial leadership, and I'm confident we'll continue to create industry-leading execution in demand creation, product launches and full utilization of the omnichannel. This is an important modification in our tactics. And the COVID pandemic was a trigger that accelerated this change at the end of March and into Q2. We've gained important insight where our own capabilities are superior, and we're adjusting our investments accordingly.

Id. at 125–26 (emphases omitted).

[12] After Elanco released its first quarter financial report, its common stock price decreased by $3.05 and closed at $19.88 per share on May 7, 2020. By May 21, 2020, Elanco's common stock price had decreased to $18.94. Similarly, the price of Elanco's equity units decreased by $6.26 and closed at $37.00 per unit on May 7, 2020. By May 22, 2020, Elanco's equity unit price had decreased to $35.11. (**Id.**)

[13] On May 20, 2020, in the District Court for the Southern District of Indiana, several individuals who purchased securities through the Offering filed a class action complaint against Elanco and others for alleged violations of federal

securities law (the "Federal Case").[3] While the Federal Case was pending, on October 16, 2020, in Marion County, Indiana, the Investors[4] filed a class action complaint against the Offerors[5] (the "State Case"), alleging the Offerors violated certain sections of the Securities Act of 1933[6] (the "1933 Act") and related regulations. In December 2020, the Investors filed their first amended complaint in the State Case. In January 2021, the defendants in the Federal Case filed a motion to dismiss that complaint, and shortly thereafter, the Offerors sought a stay of proceedings in the State Case, which the trial court granted. On August 17, 2022, the District Court for the Southern District of Indiana dismissed with prejudice all the plaintiffs' claims in the Federal Case. *Hunter v. Elanco Animal Health Inc.*, No. 1:20-CV-01460-SEB-MG, 2022 WL 3445173 (S.D. Ind. Aug. 17, 2022).

[14] The trial court in the State Case subsequently lifted the stay, and the Offerors filed a Trial Rule 12(B)(6) motion to dismiss the Investors' first amended complaint. One week before the scheduled hearing on the Offerors' motion, the Investors sought leave to amend their complaint for a second time; the Offerors

---

[3] The parties and claims in the Federal Case are similar but not identical to the parties and claims in this case. For instance, the Federal Case includes claims sounding in fraud; the State Case does not include such allegations.

[4] Safron Capital Corporation and The General Retirement System of the City of Detroit.

[5] Elanco; Jeffrey N. Simmons; Todd S. Young; James M. Meer; R. David Hoover; Kaila Kaput Anand; John P. Bilbrey; Art A. Garcia; Michael J. Harrington; Deborah T. Kochevar; Lawrence E. Kurzius; Kirk McDonald; Denis Scots-Knight; Goldman Sachs & Co. LLC; Citigroup Global Markets Inc.; J.P. Morgan Securities LLC; BofA Securities, Inc.; Barclays Capital Inc.; BNP Paribas Securities Corp.; Mizuho Securities USA LLC; MUFG Securities Americas Inc.; Stifel Nicolaus & Co. Inc.

[6] 48 Stat. 74, 15 U.S.C. §§ 77a–77bbb.

did not oppose this request, and the trial court granted it. On June 8, 2023, the Investors filed their second amended complaint (the "Second Amended Complaint"), alleging in relevant part that eight disclosures in the Offering Documents[7] contained materially false or misleading statements regarding Elanco's relationship with the Companion Animal Distributors and the risks associated therewith, which violated Sections 11(a),[8] 12(a)(2),[9] and 15(a)[10] of the 1933 Act and failed to comply with Items 105[11] and 303[12] of Securities and Exchange Commission Regulation S-K.

[15] In August 2023, the Offerors filed a Trial Rule 12(B)(6) motion to dismiss the Second Amended Complaint. As part of their response in opposition to this motion, the Investors requested leave to amend their complaint if the trial court

---

[7] In the Second Amended Complaint, the Investors also challenge statements made by Elanco's CEO during the February 19, 2020, earnings call. The Investors did not address those statements in their briefing regarding the Offerors' motion to dismiss or in their appellate briefing. The Investors have thus abandoned and waived for our review their claim based on the February 19 earnings call statements. *See Morris v. BioSafe Eng'g, Inc.*, 9 N.E.3d 195 (Ind. Ct. App. 2014) (quoting Webster's 3d New Int'l Dictionary 2 (2002)) ("To 'abandon' a claim means 'to cease to assert or exercise an interest, right, or title' to it, especially 'with the intent of never again resuming or reasserting it.'"); *New Hampshire Ins. Co. v. Indiana Auto. Ins. Plan*, 176 N.E.3d 514, 524 (Ind. Ct. App. 2021) (citing *L.H. Controls, Inc. v. Custom Conveyor, Inc.*, 974 N.E.2d 1031, 1042 (Ind. Ct. App. 2012); *Dunaway v. Allstate Ins. Co.*, 813 N.E.2d 376, 387 (Ind. Ct. App. 2004)) ("It is well-established that failure to raise an argument or issue below results in waiver of that issue.").

[8] 15 U.S.C. § 77k(a).

[9] 15 U.S.C. § 77*l*(a)(2).

[10] 15 U.S.C. § 77*o*(a).

[11] 17 C.F.R. § 229.105.

[12] 17 C.F.R. § 229.303.

granted the motion. On April 17, 2024, the trial court granted the Offerors'

motion. The trial court stated in relevant part as follows:

> Elanco had no duty to disclose the Distribution Changes because the omission of the Distribution Changes from the Registration Statement did not render the Registration Statement ***materially*** misleading. *In re Time Warner Inc. Sec. Litig.*, 9 F.3d at 268 (emphasis added). An examination of the Disclosures reveals that the allegedly omitted information regarding the Distributor Changes was immaterial to each Disclosure and that each Disclosure was not rendered misleading by the omission when read in context.

Appellant's App. Vol. II at 83–84. This appeal ensued.[13] [14]

---

[13] We remind Investors' counsel that the Statement of Facts must be "devoid of argument." *Dridi v. Cole Kline LLC*, 172 N.E.3d 361, 365 (Ind. Ct. App. 2021) (citing *Ramsey v. Rev. Bd. of Ind. Dep't of Workforce Dev.*, 789 N.E.2d 486, 488 (Ind. Ct. App. 2003)).

[14] The Investors filed a motion for oral argument in this case; on March 20, 2025, we issued an order denying that motion. Additionally, after briefing in this case concluded, the Investors filed a notice of additional authority (the "Notice") pursuant to Indiana Appellate Rule 48, requesting us to consider an order issued by the SEC in November 2024. The SEC's order was based on an offer of settlement submitted by Elanco and primarily concerns "channel stuffing" allegations. "Channel stuffing" refers to "shipping to one's distributors more of one's product than one thinks one can sell." *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 709 (7th Cir. 2008). Channel stuffing can be "innocent," but it can also become "a form of fraud . . . when it is used . . . to book revenues on the basis of goods shipped but not really sold because the buyer can return them." *Id.*

The SEC's order is irrelevant to our analysis of the allegations in this case, allegations that Elanco contests and that do not concern "channel stuffing." We therefore decline to consider the SEC's order. Consequently, simultaneously with this Opinion, we have issued an order denying the Offerors' motion for leave to respond to the Notice.

## Discussion and Decision

### 1. The Trial Court Did Not Err by Dismissing the Investors' Second Amended Complaint Pursuant to Trial Rule 12(B)(6)

[16] The Investors allege the trial court erred by granting the Offerors' motion to dismiss the Second Amended Complaint pursuant to Trial Rule 12(B)(6). Our Supreme Court has explained our standard of review for such a decision as follows:

> Appellate review of a ruling on a Trial Rule 12(B)(6) motion is de novo. *Caesars Riverboat Casino, LLC v. Kephart*, 934 N.E.2d 1120, 1122 (Ind. 2010). "A motion to dismiss under Rule 12(B)(6) tests the legal sufficiency of a complaint: that is, whether the allegations in the complaint establish any set of circumstances under which a plaintiff would be entitled to relief." *Trail v. Boys & Girls Clubs of Nw. Ind.*, 845 N.E.2d 130, 134 (Ind. 2006) (citation omitted). Appellate courts do not test the sufficiency of the facts alleged regarding their adequacy to provide recovery but test the sufficiency of whether a legally actionable injury has occurred in a plaintiff's stated factual scenario. *Id.* The appellate court accepts the alleged facts as true, drawing every reasonable inference in favor of the non-moving party. *Id.* An order to dismiss is affirmed when it is "apparent that the facts alleged in the challenged pleading are incapable of supporting relief under any set of circumstances." *McQueen v. Fayette Cnty. Sch. Corp.*, 711 N.E.2d 62, 65 (Ind. Ct. App. 1999), *trans. denied*.

*Safeco Ins. Co. of Ind. v. Blue Sky Innovation Grp., Inc.*, 230 N.E.3d 898, 901–02 (Ind. 2024), *reh'g denied* (June 3, 2024).

[17] Indiana is a notice-pleading state. *ResCare Health Servs., Inc. v. Ind. Fam. & Soc. Servs. Admin.*, 184 N.E.3d 1147, 1153 (Ind. 2022). As such, Trial Rule 8 only

requires a pleading to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Ind. Trial Rule 8(A)(1). "The purpose of notice pleading is to inform a defendant of a claim's operative facts so the defendant can 'prepare to meet it.'" *ResCare Health Servs.*, 184 N.E.3d at 1153 (quoting *Bayer Corp. v. Leach*, 147 N.E.3d 313, 315 (Ind. 2020)). "A complaint's allegations are sufficient if they put a reasonable person on notice as to why a plaintiff sues." *Id.* (quoting *ARC Constr. Mgmt., LLC v. Zelenak*, 962 N.E.2d 692, 697 (Ind. Ct. App. 2012)).

[18] The Investors specifically contend that the Second Amended Complaint sufficiently alleged that eight disclosures in the Offering Documents violated certain provisions of the 1933 Act and Regulation S-K. Our discussion of the Investors' claims proceeds in four parts: (a) first, we review the relevant law regarding the 1933 Act; (b) second, we review the relevant law concerning Regulation S-K; (c) third, we apply these laws to the eight disclosures the Investors challenge to determine if there is any set of circumstances under which the Investors are entitled to relief; and (d) fourth, we summarize our analysis.

### a. The 1933 Act

[19] The 1933 Act "protects investors by ensuring that companies issuing securities (known as 'issuers') make a 'full and fair disclosure of information' relevant to a public offering." *California Pub. Emps.' Ret. Sys. v. ANZ Sec., Inc.*, 582 U.S. 497, 501 (2017) (quoting *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 178 (2015)). Pursuant to the 1933 Act, the issuer must file

certain offering documents that contain specified information about both the company itself and the security for sale.  *Id.* (citing *Omnicare*, 575 U.S. at 178); *see also* 15 U.S.C. §§ 77g, 77aa.  Sections 11 and 12 of the 1933 Act promote compliance with these disclosure requirements by giving purchasers a right of action against an issuer and other designated individuals for misstatements or omissions of material facts in the offering documents.  *See Omnicare*, 575 U.S. at 178; 15 U.S.C. §§ 77k(a), 77*l*(a)(2).  Section 15 of the 1933 Act further promotes compliance by extending liability under Sections 11 and 12 to persons who control those who are liable under those sections.  15 U.S.C. § 77*o*.

[20]     Section 11(a) provides in relevant part as follows:

> In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security may . . . sue . . . .

15 U.S.C. § 77k(a).  Section 12(a)(2) provides in relevant part as follows:

> Any person who . . . offers or sells a security . . . by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), . . . shall be liable . . . to the person purchasing such security from him, who may sue . . . .

15 U.S.C. § 77*l*(a)(2).

[21] Both Sections 11(a) and 12(a)(2) create two ways to hold issuers and sellers liable for the contents of offering documents: (1) for what those documents say, and (2) for what those documents do not say. *See* 15 U.S.C. §§ 77k(a), 77*l*(a)(2); *Macquarie Infrastructure Corp. v. Moab Partners, L. P.*, 601 U.S. 257, 263–65 (2024) (citing *Omnicare*, 575 U.S. at 186 n.3) ("By its terms, in addition to proscribing lies and half-truths, [Section 11] also creates liability for failure to speak on a subject at all."). Under either theory of liability, "the buyer need not prove (as he must to establish certain other securities offenses) that the defendant acted with any intent to deceive or defraud." *Omnicare*, 575 U.S. at 179 (citing *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381–382 (1983)).

[22] A key question under both theories of liability is whether the fact that is falsely stated or omitted is *material*. *See* 15 U.S.C. §§ 77k(a), 77*l*(a)(2). "While materiality is normally a question of fact reserved for the trier of fact, we can resolve materiality as a matter of law when the information at issue is so obviously unimportant that reasonable minds could not differ*." Smykla v. Molinaroli*, 85 F.4th 1228, 1236 (7th Cir. 2023) (internal citations omitted); *see also TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976) (quoting *Johns Hopkins Univ. v. Hutton*, 422 F.2d 1124, 1129 (4th Cir. 1970)); *Omni Ins. Grp. v. Poage*, 966 N.E.2d 750 (Ind. Ct. App. 2012) (citing *Colonial Penn Ins. Co. v. Guzorek*, 690 N.E.2d 664, 673 (Ind. 1997)). To be material, there must be a substantial likelihood that the misstatement or omission "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of the information made available." *TSC Indus.*, 426 U.S. at 449; *see also Manns*

*v. Skolnik*, 666 N.E.2d 1236, 1249 n.8 (Ind. Ct. App. 1996) (quoting *TSC Indus.*, 426 U.S. at 449), *trans. denied*.

[23] "We 'look at all available information in determining the materiality of a challenged omission or misstatement.'" *Smykla*, 85 F.4th at 1236 (quoting *Kuebler v. Vectren Corp.*, 13 F.4th 631, 639 (7th Cir. 2021)). We assume the reasonable investor "reads each statement within . . . a document, whether of fact or of opinion, in light of all its surrounding text, including hedges, disclaimers, and apparently conflicting information." *Omnicare*, 575 U.S. at 190. We also assume "the investor takes into account the customs and practices of the relevant industry." *Id.*

[24] Notably, regarding omissions, "firms are entitled to keep silent (about good news as well as bad news) unless positive law creates a duty to disclose." *Gallagher v. Abbott Labs.*, 269 F.3d 806, 808 (7th Cir. 2001) (citing *Basic, Inc. v. Levinson*, 485 U.S. 224, 239 n. 17 (1988); *Dirks v. SEC*, 463 U.S. 646, 653–54 (1983); *Chiarella v. United States*, 445 U.S. 222, 227–35 (1980); *Stransky v. Cummins Engine Co.*, 51 F.3d 1329, 1331 (7th Cir. 1995); *Backman v. Polaroid Corp.*, 910 F.2d 10, 16 (1st Cir. 1990) (en banc)). By their plain language, Sections 11(a) and 12(a)(2) do not create an affirmative duty to disclose *any and all* material information. *See* 15 U.S.C. §§ 77k(a), 77*l*(a)(2). Disclosure is required under Section 11(a) if it is mandated by law or if a statement, when read in context, would be misleading without the additional information. *See* 15 U.S.C. § 77k(a). Similarly, disclosure is required under Section 12(a)(2) if a

statement, when read in context, would be misleading without the additional information.  *See id.* § 77*l*(a)(2).

### b.  *Regulation S-K*

Regulation S-K generally outlines how companies should disclose material qualitative descriptors of their businesses on registration statements and certain other SEC filings.  To that end, Item 105 requires, in relevant part, that a reporting company disclose certain risk factors:

> (a)  Where appropriate, provide under the caption "Risk Factors" a discussion of the material factors that make an investment in the registrant or offering speculative or risky.  . . .  [E]ach risk factor should be set forth under a subcaption that adequately describes the risk.  . . .
>
> (b)  Concisely explain how each risk affects the registrant or the securities being offered.  . . .

17 C.F.R. § 229.105.

Item 303 requires, in relevant part, that a reporting company include a discussion and analysis of its financial condition and results of operations, including a description of "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  17 C.F.R. § 229.303(a)(3)(ii) (effective from May 2, 2019, to Feb. 9, 2021).  In addition, if the company "knows of events that will cause a material change in the relationship between costs and revenues (such as known

future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed." *Id.* Notably, these discussions must "focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition," *id.* § 229.303(a) Instruction 3, and any "forward-looking information" the reporting company provides "is expressly covered by the safe harbor rule for projections," *id.* Instruction 7; *see also* 15 U.S.C. § 77z-2 (safe harbor); 17 C.F.R. § 230.175 (safe harbor).

[27] Item 303 triggers a duty to disclose when "a trend, demand, commitment, event, or uncertainty" is (1) "presently known to management" and (2) "reasonably likely to have material effects on the [company]'s financial condition or results of operations." *Indiana Pub. Ret. Sys. v. Pluralsight, Inc.*, 45 F.4th 1236, 1269 (10th Cir. 2022) (quoting *Slater v. A.G. Edwards & Sons, Inc.*, 719 F.3d 1190, 1197 (10th Cir. 2013)); Management's Discussion and Analysis of Financial Condition, Securities Act Release No. 6835, 54 Fed. Reg. 22427-01, 22429 (May 24, 1989). Generally, "risk factors that are not 'reasonably likely to be material under Item 303' are not material factors that render an offering speculative or risky under Item 105." *Kolominsky v. Root, Inc.*, 100 F.4th 675, 685 (6th Cir. 2024) (quoting *Hutchison v. Deutsche Bank Sec. Inc.*, 647 F.3d 479, 484 n.4 (2d Cir. 2011)).

### c. *The Challenged Disclosures*

The Investors allege that eight disclosures in the Offering Documents were false or misleading, thereby violating Sections 11(a), 12(a)(2), and 15. In the Second Amended Complaint, the Investors allege all eight disclosures are false or misleading because the Offering Documents should have disclosed the following:

> (i) prior to the Offering Elanco had initiated a plan to have Elanco internally drive the demand creation of its Companion Animal segment; (ii) as part of that plan, Elanco decided to bring down distributor inventory of such Companion Animal products; (iii) also as part of that plan, Elanco reduced its Distributors from eight to four; (iv) these Distribution Changes created a material risk that Elanco's Companion Animal segment would have substantially reduced sales and that segment's earnings, at a minimum, would be substantially reduced during 1Q 2020; and (v) as a result, Elanco's financial results were likely to be materially adversely impacted.

Appellants' App. Vol. V at 118–19, 122, 124–25, 135. The Investors further assert that the Offering Documents "led investors to believe that [Elanco] was continuing with its stable distribution relationships, while, in fact, it was overhauling the entire distribution process." *Id.* at 117, 120.

First, we address the Investors' allegations in the context of the five challenged business disclosures (collectively, the "Business Disclosures"). Second, we address the allegations in the context of the three challenged risk disclosures (collectively, the "Risk Disclosures"). Third, we address the Investors' arguments regarding post-Offering analyst statements.

### i.    The Business Disclosures

[30]    First, the Investors challenge the following business disclosure ("Business Disclosure 1") that appears under the heading "**Industry**" and the subheading "***Key Structural Characteristics of the Animal Health Industry***":

> ***Deep customer relationships.***  Direct customer models allow animal health sales representatives and veterinary consultants to develop a deep understanding of customer needs, which often facilitate strong and impactful relationships.  Representatives and consultants frequently partner with customers through product support and analytics, driving additional value for the customer[.]

Appellants' App. Vol. VII at 50 (emphasis in original); *see also* Appellants' App. Vol. V at 117–18.

[31]    Second, the Investors challenge the following business disclosure that appears under the heading "**Sales and Marketing**":

> Our sales organization includes sales representatives, veterinary consultants and other value-added specialists.  In markets where we do not have a direct commercial presence, we generally contract with distributors that provide logistics and sales and marketing support for our products.
>
> Our sales representatives visit our customers, including consultants, veterinarians, food animal producers, and resellers, to inform, promote and sell our products and to support customers.  Our veterinary consultants provide scientific consulting focused on disease management and herd management, training and education on diverse topics, including responsible product use, and generally have advanced degrees in

veterinary medicine, veterinary nutrition or other agriculture-related fields. These direct relationships with customers allow us to understand their needs. Additionally, our sales representatives and veterinary consultants focus on collaborating with our customers to educate and support them on topics such as local disease awareness and to help them adopt new and more sophisticated animal health solutions, including through the use of our products. As a result of these relationships, our sales and consulting visits provide us with access to customer decision makers. In addition, our sales and marketing organization provides enhanced value by providing support to food animal producers to help maximize their yields and reduce costs. Our analytics help customers analyze large amounts of health and production data. As of September 30, 2019, we had approximately 1,400 sales representatives.

Appellants' App. Vol. VII at 186–87; Appellants' App. Vol. V at 118.

[32] Third, the Investors challenge the following business disclosure ("Business Disclosure 3") that appears under the heading "**Our Competitive Strengths**":

We believe the following strengths create sustainable competitive advantages that will enable us to continue to grow as a leader in the animal health industry.

- *Established leader with a global presence, diversified product portfolio and full channel coverage.* We are the fourth largest animal health company in the world, with over $3 billion in revenue for the year ended December 31, 2018. Globally, we are #1 in medicinal feed additives, #2 in poultry, and #3 in other pharmaceuticals, which are mainly companion animal therapeutics, measured by 2018 revenue, according to Vetnosis. We also have one of the broadest portfolios of pet parasiticides in the companion animal sector,

based on indications, species and formulations. We have a comprehensive and diversified product portfolio, with more than 125 brands sold in more than 90 countries. In 2018, our top 10 products accounted for 42% of our revenue, with our top selling product accounting for approximately 11% of our revenue. Our global footprint includes a local sales force presence in 43 countries and third-party distribution relationships serving other relevant markets. . . .

Appellants' App. Vol. VII at 51 (emphasis in original); *see also* Appellants' App. Vol. V at 118.

[33]     Fourth, the Investors challenge the following portions of the business disclosure ("Business Disclosure 4") that appears under the heading "**Our Targeted Value-Generating Strategies**":

> We intend to continue to grow our business and create value for our shareholders through a targeted value-generating strategy with three key pillars: a Portfolio Strategy for our marketed products, an Innovation Strategy for our R&D pipeline and a Productivity Strategy for our margin expansion initiatives. The acquisition of the Bayer Animal Health Business is expected to further strengthen and accelerate our value-generating strategy.
>
> *Portfolio Strategy*
>
> - ***Invest in categories with the greatest potential for growth.*** We are focusing the majority of our resources, including more than 75% of our R&D funding, on our three targeted growth categories: CA Disease Prevention, CA Therapeutics and FA Future Protein & Health, where we believe we are well positioned to

grow faster than the market. These categories represented 59% of our revenue in 2018.

* * *

- ***CA Disease Prevention*** — Parasiticides and vaccines are fundamental to preventing disease in companion animals. We have a strong vaccines portfolio as well as products that protect pets from a broad spectrum of parasites, such as fleas, ticks, heartworms, roundworms, hookworms, whipworms and tapeworms. We believe we are well positioned to drive additional growth through continued product innovation and sales channel expansion.

* * *

*Productivity Strategy*

- ***Leverage our productivity capabilities to improve operating margins***. . . .

* * *

- ***SG&A excellence***. Our sales strategy is focused on achieving growth in our targeted product categories while increasing productivity within our sales force. We plan to utilize both our sales force's strong customer relationships and our strategic distributor partnerships to efficiently grow demand for our products. . . .

Appellants' App. Vol. VII at 54–56; *see also* Appellants' App. Vol. V at 118.

[34] Fifth, the Investors challenge the following business disclosure ("Business Disclosure 5") that appears under the heading "**Customers**":

> . . . We primarily sell our companion animal products to third-party distributors, as well as directly to veterinarians that typically then sell our products to pet owners. We are also expanding into retail channels in order to meet pet owners where they want to purchase. Our largest customer, an affiliate of AmerisourceBergen Corp., is a third-party veterinary distributor and represented approximately 12% of our revenue for the year ended December 31, 2018. Our next largest customer represented approximately 7% of our revenue for the year ended December 31, 2018 and no other customer represented more than 5% of our revenue for the same period.

Appellants' App. Vol. VII at 187; *see also* Appellants' App. Vol. V at 119 (emphases omitted).

[35] Business Disclosure 1 does not focus on or even mention the Companion Animal segment of Elanco's business, let alone the Companion Animal Distributors; this disclosure instead focuses on the value added by Elanco's internal sales force when it directly deals with customers. Similarly, Business Disclosure 2 primarily focuses on Elanco's direct relationships with customers and how these relationships help Elanco's business. The disclosure mentions that where Elanco does "not have a direct commercial presence," it "generally contract[s] with distributors that provide logistics and sales and marketing support for [its] products," Appellants' App. Vol. V at 186, but this small caveat to Elanco's discussion of its sales and marketing is not specific to the

Companion Animal segment of its business or the Companion Animal Distributors.

[36] Business Disclosures 3 and 5 predominantly focus on data from 2018. Elanco's failure to disclose the distribution changes that occurred in late 2019 and early 2020 did not render the historical facts in these disclosures false or misleading. *See McDonald v. Kinder-Morgan, Inc.*, 287 F.3d 992, 998 (10th Cir. 2002) (collecting cases) ("It is well-established that the accurate reporting of historic successes does not give rise to a duty to further disclose contingencies that might alter the revenue picture in the future.") In fact, the historical information in Business Disclosure 3 suggests that the distribution changes were not likely to be material because Elanco's "global footprint" was primarily comprised of "a local sales force presence" while its "third-party distribution relationships serv[ed] other relevant markets." Appellants' App. Vol. V at 51. Likewise, the historical information in Business Disclosure 5 suggests that the distribution changes were not likely to be material because most of Elanco's Companion Animal Distributors accounted for five percent or less of Elanco's total revenue in 2018.

[37] Business Disclosure 4 focuses on Elanco's current and future plans to grow its business. The Investors argue that this disclosure "provided a specific goal and intended approach for reaching it – growth through Elanco's 'strategic partnerships.'" Appellants' Br. at 40 (quoting Appellants' App. Vol. V at 118). Therefore, Elanco was "'under an obligation to disclose other approaches to reaching the goal' – particularly considering that 'those approaches' were not

just 'under active and serious consideration,' but had been planned and at least partially instituted prior to the Offering." *Id.* (quoting *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 268 (2d Cir. 1993)). The Court of Appeals for the Second Circuit has held that "when a corporation is pursuing a specific business goal and announces that goal as well as an intended approach for reaching it, it may come under an obligation to disclose other approaches to reaching the goal when those approaches are under active and serious consideration." *Time Warner*, 9 F.3d at 268. For instance, in *In re Time Warner Inc. Securities Litigation*, Time Warner was in desperate need of capital, so it "embarked on a highly publicized campaign to find international 'strategic partners,'" made positive public statements about its progress in this endeavor that "impl[ied] to varying degrees that significant partnerships will be consummated and announced in the near future," and failed to disclose that the search for strategic partners was not going as well as expected and Time Warner was investigating alternative methods of raising capital such as a stock offering. *Id.* at 262. According to the Second Circuit, a "successful strategic alliance . . . would have improved the corporation's expected profit stream, and should have served to drive up the share price," but offering new shares of the company to raise the necessary capital "would dilute the ownership rights of existing shareholders, likely decrease dividends, and drive down the price of the stock." *Id.* at 267. The Second Circuit concluded that "Time Warner *may* have come under a duty to disclose facts that would place the statements concerning strategic alliances in a materially different light" because it "publicly hyped strategic alliances" and its "public statements could have been understood by reasonable investors

to mean that the company hoped to solve the *entire* debt problem through strategic alliances." *Id.* at 268 (first emphasis added, second emphasis in original).

[38] The information disclosed in Business Disclosure 4, the other challenged disclosures, and the Offering Documents as a whole do not give rise to such a duty. In relevant part, Business Disclosure 4 identifies Elanco's Companion Animal disease prevention products as having potential for growth and then states Elanco's *belief* that it is "well positioned to drive additional growth through continued product innovation and sales channel expansion." Appellants' App. Vol. V at 56. The disclosure also states that Elanco "*plan*[*s*] to utilize both [its] sales force's strong customer relationships and [its] strategic distributor partnerships to efficiently grow demand for [its] products." *Id.* at 57 (emphasis added). Unlike the statements at issue in *Time Warner*, the statements in Business Disclosure 4 are general statements of belief and intent, not statements of specific plans.

[39] Based on the foregoing and accepting all alleged facts as true and drawing every reasonable inference in favor of the Investors as the nonmovants, the changes in Elanco's relationship with the Companion Animal Distributors were not material because such information would have been unimportant to the reasonable investor in evaluating the Business Disclosures. Specifically, the Business Disclosures primarily concerned historical facts that were accurately reported, general statements of belief and intent rather than specific commitments, and information that constituted a small portion of Elanco's

overall business operations. As such, the Business Disclosures are incapable of supporting relief under any set of circumstances. We cannot say the Business Disclosures contained any untrue statement of material fact or omitted any material fact that was required or otherwise necessary to make them not misleading. Accordingly, we cannot say the trial court erred in granting the Offerors' motion to dismiss as to the Investors' claims concerning the Business Disclosures.

### ii. The Risk Disclosures

First, the Investors challenge the following risk disclosure ("Risk Disclosure 1") that appears under the heading "**Risks Related to Our Business**" and the subheading "***Consolidation of our customers and distributors could negatively affect the pricing of our products.***":

> Third-party distributors, veterinarians and food animal producers are our primary customers. In recent years, there has been a trend towards the concentration of veterinarians in large clinics and hospitals. In addition, food animal producers, particularly swine and poultry producers, and our distributors have seen recent consolidation in their industries. Furthermore, we have seen the expansion of larger cross-border corporate customers and an increase in the consolidation of buying groups (cooperatives of veterinary practices that leverage volume to pursue discounts from manufacturers). The pace of consolidation and structure of markets varies greatly across geographies. If these trends towards consolidation continue, our customers could attempt to improve their profitability by leveraging their buying power to obtain favorable pricing. The resulting decrease in our prices could have material adverse effect on our business, financial condition and results of operations.

Appellants' App. Vol. VII at 84; *see also* Appellants' App Vol. V at 120 (emphasis omitted).

[41]     Second, the Investors challenge the following risk disclosure ("Risk Disclosure 2") that appears under the heading "**Risks Related to Our Business**" and the subheading "***For our companion animal products, increased use of alternative distribution channels, or changes within existing distribution channels, could negatively impact our market share, margins and distribution of our products.***":

> In most markets, pet owners typically purchase their animal health products directly from veterinarians. However, pet owners increasingly have the option to purchase animal health products from sources other than veterinarians, such as online retailers, "big-box" retail stores or other over-the-counter distribution channels. This trend has been demonstrated by the significant shift away from the veterinarian distribution channel in the sale of flea and tick products in recent years.
>
>    * * *
>
> Over time, these and other competitive conditions may increase our use of online retailers, "big-box" retail stores, or other over-the-counter distribution channels to sell our companion animal products. We may not be adequately prepared or able to distribute our companion animal products if an increased portion of our sales occur through these channels. Also, we may realize lower margins on sales through these distribution channels than we do on sales through veterinarians. Any of these events could materially adversely affect our business, financial condition and results of operations.

In addition, if one or more of our companion animal distributors discontinues or modifies their relationship with us, our business, financial condition and results of operations may be materially adversely affected. For example, in 2017, a change in our U.S. inventory management practices resulted in a revenue lag as existing inventory was sold down.

Appellants' App. Vol. VII at 88–89; *see also* Appellants' App Vol. V at 121 (emphasis omitted).

Third, the Investors challenge the following risk disclosure ("Risk Disclosure 3") that appears under the heading "**Risks Related to Our Business**" and the subheading "*Increased or decreased inventory levels at our channel distributors lead to fluctuations in our revenues and variations in payment terms extended to our distributors can impact our cash flows.*":

In addition to selling our products directly to veterinarians, we sell to distributors who, in turn, sell our products to third parties. Inventory levels at our distributors may increase or decrease as a result of various factors, including end customer demand, new customer contracts, heightened and generic competition, required minimum inventory levels, our ability to renew distribution contracts with expected terms, our ability to implement commercial strategies, regulatory restrictions, unexpected customer behavior, and procedures and environmental factors beyond our control, including weather conditions or an outbreak of infectious disease carried by food animals, such as African Swine Fever. These increases and decreases can lead to variations in our quarterly and annual revenues. In addition, like all companies that manufacture and sell products, we have policies that govern the payment terms that we extend to our customers. Due to consolidation amongst our distributors, as well as changes in the buying habits of end customers or the need

> for certain inventory levels at our distributors to avoid supply disruptions, from time to time, our distributors have requested exceptions to the payment term policies that we extend to them. Extensions of customer payment terms can impact our cash flows, liquidity and results of operations.

Appellants' App. Vol. VII at 90; *see also* Appellants' App Vol. V at 121–22 (emphases omitted).

[43]   Risk Disclosure 1 focuses on certain segments of Elanco's customers—such as veterinarians, distributors, product producers, and buying groups—consolidating among themselves, in part to pursue discounts from manufacturers. Such consolidation, according to Risk Disclosure 1, could lead these customers to also pursue discounts from Elanco, which could negatively impact Elanco's business. In short, and contrary to the Investors' assertions, Risk Disclosure 1's discussion of consolidation focuses on customer consolidation, not Elanco's consolidation of its Companion Animal Distributors. Risk Disclosure 1 is also not specific to the Companion Animal segment of Elanco's business. Therefore, contrary to the Investors' allegations, the risks contemplated by Risk Disclosure 1 had not yet materialized.

[44]   Risk Disclosure 2 discusses trends in and risks for Elanco's distribution channels, and it primarily focuses on consumers' decreasing reliance on veterinarians and increasing reliance on other retailers for their Companion Animal product needs. It is in the context of this trend that Elanco states a Companion Animal Distributor's choice to discontinue or modify its relationship with Elanco would pose a risk to Elanco's Companion Animal

business, especially because Elanco "may not be adequately prepared or able to distribute [its] companion animal products if an increased portion of [its] sales occur through" online retailers, stores, and over-the-counter distribution channels, Appellants' App Vol. VII at 89. The Investors allege that the risks associated with the Companion Animal Distributors "had already materialized and were not mere possibilities." Appellants' App. Vol. V at 123. However, the Investors read the portion of Risk Disclosure 2 about the Companion Animal Distributors in isolation. Reading Risk Disclosure 2 in its entirety shows that the discussed risks had not yet materialized because they were contingent on consumers increasingly buying Companion Animal products from non-veterinarian retailers.

[45] Risk Disclosure 3 focuses on the effect distributors' inventory level changes have on Elanco's business. In relevant part, this disclosure states that "increases and decreases [in inventory levels] can lead to variations in [Elanco's] quarterly and annual revenues." Appellants' App. Vol. V at 90. It also warns that distributors "have requested exceptions to the payment term policies that [Elanco] extend[s] to them" based on a number of factors, including "consolidation amongst [Elanco's] distributors," "changes in the buying habits of end customers," and "changes in . . . the need for certain inventory levels at [Elanco's] distributors." *Id.* These extensions of "payment terms can impact [Elanco's] cash flow, liquidity and results of operations." *Id.* Notably, none of the risks discussed in Risk Disclosure 3 are specific to the

Companion Animal Distributors, and those risks are generic, forward-looking warnings about using distributors to move product.

[46] Based on the foregoing and accepting all alleged facts as true and drawing every reasonable inference in favor of the Investors as the nonmovants, the changes in Elanco's relationship with the Companion Animal Distributors was not material because such information would have been unimportant to the reasonable investor in evaluating the Risk Disclosures. The same is true of the Offering Documents as a whole. We thus cannot say the Risk Disclosures contained any untrue statement of material fact or omitted any material fact that was necessary to make them not misleading. We also cannot say that the Risk Disclosures failed to include information required by Items 105 and 303. Accordingly, we cannot say the trial court erred in granting the Offerors' motion to dismiss as to the Investors' claims concerning the Risk Disclosures.

### iii. Post-Offering Statements

[47] In addition to the Business and Risk Disclosures, the Investors point to statements made by analysts after Elanco released its financial results for the first quarter of 2020 to demonstrate that information regarding the distribution changes was material. For instance, one analyst stated: "[M]ost surprisingly, while many other manufacturers in the space saw positive stocking effects due to the [COVID-19] pandemic, Elanco disclosed a shift in distribution strategy that caused the company to reduce its level of channel inventory, leading to lower-than-expected companion animal revenues." Appellants' App. Vol. V at 130 (emphasis omitted). Another analyst stated: "Elanco's Q1 results were

heavily impacted by the strategic decision to reduce inventory within distribution channels. The disruptions from COVID-19 across the supply chain led ELAN to accelerate its shift away from distributors, leading to a $60M destocking headwind that mostly impacted the companion business ($206M, -22%)." *Id.* (emphasis omitted).

[48] When evaluating claims under the 1933 Act and its disclosure requirements, we take an "ex ante" approach, not an "ex post" approach. *Wielgos v. Commonwealth Edison Co.*, 892 F.2d 509, 518 (7th Cir. 1989) (emphases omitted); *see also Nguyen v. MaxPoint Interactive, Inc.*, 234 F. Supp. 3d 540, 545–46 (S.D.N.Y. 2017) (quoting *Charter Twp. of Clinton Police & Fire Ret. Sys. v. KKR Fin. Holdings LLC*, No. 08 CIV. 7062 PAC, 2010 WL 4642554 at *11 (S.D.N.Y. Nov. 17, 2010)) ("'[P]laintiffs are not allowed to plead Section 11 claims with the benefit of 20/20 hindsight' because 'Section 11 claim[s] cannot be based on a "backward-looking assessment" of the registration statement.'" (second alteration in original)). "Issuers and underwriters must decide what information will be useful without burying investors under a blizzard of paper." *Wielgos*, 892 F.2d at 518 (citing *Greenapple v. Detroit Edison Co.*, 618 F.2d 198, 210 (2d Cir.1980)). "No one's interests would be served by requiring the details [an investor] demands from the privileged position of hindsight, as opposed to the 'brief[ ]' description the SEC solicited" via the 1933 Act. *Id.* (second alteration in original).

[49] The Investors' reliance on post-Offering analyst statements to establish the materiality of the distribution changes is exactly the type of materiality-by-

hindsight approach in which we cannot engage. *See Wielgos*, 892 F.2d at 518; *see also Nguyen*, 234 F. Supp. 3d at 545–46 (quoting *Charter Twp. of Clinton Police & Fire Ret. Sys.*, No. 08 CIV. 7062 PAC, 2010 WL 4642554 at *11). Consequently, the Investors' arguments based on the post-Offering analyst statements are unpersuasive.

### d. Summation

[50] Accepting all the alleged facts as true and drawing every reasonable inference in favor of the Investors, there is a substantial likelihood that the reasonable investor would not have viewed information about Elanco's changes to its relationships with some of the Companion Animal Distributors as significantly altering the total mix of the information in the Offering Documents. The distribution change information was therefore not material,[15] so the Offerors had no duty to disclose it and its omission from the Offering Documents is not actionable under Sections 11(a), 12(a)(2), and 15. Consequently, the Investors have failed to state a claim upon which relief can be granted, and the trial court did not err by dismissing the Second Amended Complaint.

---

[15] Because we conclude that the distribution changes were not material facts or circumstances that had to be disclosed, we need not address the Investors' argument regarding the Private Securities Litigation Reform Act, which provides a safe harbor for private actions arising thereunder that are based on untrue statements of material fact or omissions of material facts, 15 U.S.C. § 78u-5(c)(1).

## 2. The Trial Court Did Not Err by Not Addressing the Investors' Preemptive Request for Leave to Amend their Complaint if the Trial Court Granted the Motion to Dismiss

The Investors also argue that the trial court erred by not addressing their preliminary request for leave to amend their complaint if the trial court granted the Offerors' motion to dismiss. However, as the Offerors contend, the trial court did not need to address this request because Trial Rule 12(B) gave the Investors the right to amend their complaint within 10 days of the dismissal order: "When a motion to dismiss is sustained for failure to state a claim under subdivision (B)(6) of this rule *the pleading may be amended once as of right pursuant to Rule 15(A) within ten [10] days* after service of notice of the court's order sustaining the motion and thereafter with permission of the court pursuant to such rule," T.R. 12(B) (emphasis added).

The Indiana Supreme Court has held that a plaintiff who has already amended a complaint pursuant to Trial Rule 15 still has "the right and opportunity to plead over within ten days" pursuant to Trial Rule 12(B) after a Trial Rule 12(B)(6) motion is granted. *Constantine v. City-Cnty. Council of Marion Cnty.*, 267 Ind. 279, 281–82, 369 N.E.2d 636, 638 (1977); *see also State Farm Mut. Auto. Ins. Co. v. Shuman*, 175 Ind. App. 186, 194, 370 N.E.2d 941, 949 (1977) (holding that when a Trial Rule 12(B)(6) motion is granted, the "plaintiff has an absolute right to correct any deficiencies in his complaint within ten days"); *cf. Gordon v. Purdue Univ.*, 862 N.E.2d 1244, 1253 (Ind. Ct. App. 2007) (holding that when a complaint has been dismissed under Trial Rule 12(B)(6) once and consequently

amended, the plaintiff does not have automatic right to replead when the complaint is dismissed a second time under Trial Rule 12(B)(6)).

[53] Furthermore, Indiana law is clear that once a complaint is dismissed under Trial Rule 12(B)(6), the plaintiff has two options: "(1) determine that the claims only currently lack merit because of the way in which they are pleaded—a matter of form—and correct the pleadings; or (2) reject the trial court's ruling and its implication and challenge the ruling on appeal." *DeCola v. Steinhilber*, 207 N.E.3d 440, 446–47 (Ind. Ct. App. 2023), *reh'g denied* (May 9, 2023); *see also Thacker v. Bartlett*, 785 N.E.2d 621, 624–25 (Ind. Ct. App. 2003). The Investors failed to exercise their right to replead within 10 days, and instead of seeking leave to belatedly amend their complaint after the ten-day window passed, they initiated this appeal. The Investors cannot now complain that the trial court erred by not addressing their preemptive request for leave.

## Conclusion

[54] In sum, the trial court did not err by dismissing the Second Amended Complaint, and it did not err by not addressing the Investors' preliminary request for leave to amend their complaint if it was dismissed. We therefore affirm the trial court on all issues raised.

[55] Affirmed.

Pyle, J., and Weissmann, J., concur.

ATTORNEYS FOR APPELLANTS

Brad A. Catlin
Carol Nemeth Joven
Williams Law Group, LLC
Indianapolis, Indiana

Jack G. Fruchter
Mitchell M.Z. Twersky
Abraham, Fruchter & Twersky, LLP
New York, New York

Patrice L. Bishop
Abraham, Fruchter & Twersky, LLP
Beverly Hills, California


ATTORNEYS FOR APPELLEES

Paul A. Wolfla
Jane Dall Wilson
Jason M. Rauch
Liam Williams
Faegre Drinker Biddle & Reath LLP
Indianapolis, Indiana

Jackie M. Bennett Jr.
Tracy N. Betz
Taft Stettinius & Hollister LLP
Indianapolis, Indiana

Joseph L. Motto
Jeffrey J. Huelskamp
Linda A. Greene
Winston & Strawn LLP
Chicago, Illinois